**HARRIES et al. v. AIR KING PRODUCTS CO., Inc.**

No. 210, Docket 21600.

United States Court of Appeals
Second Circuit.

Argued April 13, 1950.

Decided June 20, 1950.

———◆———

Kenyon & Kenyon, New York City, Theodore S. Kenyon, New York City, Ralph L. Chappell, Joseph C. Sweet, Jr., New York City, of counsel, for appellant.

Spence, Hotchkiss, Parker & Duryee, New York City, Stephen H. Philbin, New York City, for appellee.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

L. HAND, Chief Judge.

Judge Galston's full and considered opinion is reported[1] and states the positions of both sides, the evidence, and the law. We need add nothing to it by way of prelude to our own discussion; and we shall address ourselves at once to the questions in dispute, presupposing an acquaintance with it. The only issues which we deem it important to consider are validity and infringement, because, although the defendant has also raised the question of laches, and of the general inequity of the plaintiffs' failure to give earlier notice of their intention to sue, it is too clear for debate that both these positions are untenable. The question of validity, as is almost always the case, is enmeshed with that of infringement, and it will be most convenient to begin with it. Obviously before deciding whether the claims are valid, we must decide what they mean: i. e. what was the invention. The plaintiffs say that it consisted of a stream of electrons in which the ratio of length to cross-section is great, combined with an anode, placed at a "critical distance" from the accelerating grid, or "screen." They insist that the absolute length of the stream is not an element of the invention; and that, on the contrary, this is important only when the purpose is to "deflect" the beam, as, for example, when "multiplying frequencies." We hold that the original specifications were for long streams, regardless of the ratio of length to cross-section, because the ratio was a later and unauthorized interpolation into the application as originally filed. This is in accord with Judge Galston's Finding 15 A (1) (a), as to the first and third patents, that the "histories and the patents themselves show that the patents are for tubes having long, jet-type, electron streams"; and with his Finding 20 D(1), as to the second patent, that it "is for a tube having a long jet-type electron stream." Next, we hold that we need not decide whether Judge Galston's ruling was wrong that the claims in suit, so limited, were valid; and we shall, arguendo, assume that they are. Last, we hold that Judge Galston's finding that the defendant's tubes do not infringe the claims, when so interpreted, was not "clearly erroneous." In what follows we shall endeavor to demonstrate in the foregoing order that these three propositions are true.

### The Scope of the Invention

In their original form the introduction to the specifications of the first and third patents, consisting of seventeen typed pages, did not once mention the ratio of the length of the electron stream to its cross-section. It began by declaring that electron streams might be "arbitrarily divided" into two groups, "deflectable" and "non-deflectable"; and that, although these were "not sharply separated," the "non-deflectable" streams had "short lengths," and the "deflectable jets" were of "comparatively great length in which it has hitherto been impossible to obtain the above useful range of constants." The application declared that it would use the terms in this sense and throughout the introductory remarks it unmistakably confined the invention to "deflectable streams." Nor did any later part of the specifications once so much as allude to the ratio of the length of the streams to their cross-sec-

tion; all those passages in the specifications as they emerged in which the ratio appears, were introduced on April 1, 1935. (That is true as well of dimensions of the "typical tube" as set forth on page 2, col. 2, lines 37–49.) Shoenberg's patent had already appeared in England on February 4, 1935, and it covered all the defendant's valves here in suit; and unless the change in the specifications was no more than an "amendment" and did not substitute a new "invention," the claims in suit must be confined to absolute length.[2] Indeed it is doubtful whether even if the amendment did not substitute a new "invention," it was valid, made as it was after two years, and covering what had become part of the prior art meanwhile and had not been covered before.[3] No doubt it is at times hard to say whether amendments are a "departure from or improper addition to the specifications" or have "merely made explicit what was already implicit."[4] We have ourselves often recognized this embarrassment;[5] but we are satisfied that the expansion in this case was a substitution. The division between "deflectable jets of comparatively great length" and "non-deflectable streams having short lengths," fixed an inescapable limitation upon the invention; not only did it plainly advise the art that the invention did not cover the second type of stream, but it failed even to intimate that in practicing it anything but absolute length need be considered. Even though it were possible that a person skilled in the art might see that it was not absolute length, but the ratio of length to cross-section that was important, we should not be justified in validating such an expansion of the original; it is the sort of artful extrapolation against which courts have over and over set their faces. Moreover, when in addition the matter later included has been originally definitely disclaimed, all doubt should end. A patent must be a certain guide; not a congeries of pregnant suggestions. The claims in suit of the first and third patents must therefore be confined to "deflectable jets of comparatively great length"; "comparatively," that is, to streams which were already known to the art.

The original specifications of the second patent were not quite the same as those of the first, although there too the distinction was made between "deflectable" and "non-deflectable" streams, followed by the declaration that valves had theretofore not been satisfactory "unless the streams employed are comparatively short and 'non-deflectable'." That was in February, 1932, but on December 30, 1933, Harries cancelled these introductory remarks, and substituted almost in *ipsissimis verbis* that part of the original introduction of the first patent which we have just discussed. Indeed, in this case he went a little further, for he interjected on the third page of his proposed substitution that in the prior art it had "been considered necessary to space the electrodes in the tubes as closely as possible: *i. e.* to use the second type of stream." Then, resuming the language of the first application, he said: "The principal object of the present invention is the production of intensity control of streams of electrons of such configuration as to avoid undesirable interaction between electrodes (as in the case of streams of the first or 'deflectable' class) and having characteristics * * * comparable to those * * * of the second or non-deflectable class." Thus the application stood until June 18, 1935, when the introduction, as so amended, was cancelled and for it was substituted the first column of page one of the specifications as issued. This was the first time that the ratio of length to cross-section appeared, and the consequence is

2. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34; Muncie Gear Works, Inc. v. Outboard Marine & Manufacturing Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171.

3. Crown Cork & Seal Co. v. Ferdinand Gutmann Co., 304 U.S. 159, 58 S.Ct. 842, 82 L.Ed. 1265.

4. Marconi Wireless Telegraph Co. v. United States, 320 U.S. 1, 34, 63 S.Ct. 1393, 87 L.Ed. 1731.

5. Engineering Development Laboratories v. Radio Corporation of America, 2 Cir., 153 F.2d 523.

the same as in the case of the first and third patents: the claims must be limited to "deflectable streams": i. e. "jets of comparatively great length," as opposed to "streams having short lengths." This was further confirmed by an example (page 2, col. 2, line 45), in which the suggested distance is 1.3 centimeters, which, although shorter than the two or three centimeters of the first patent, was long indeed in comparison with the defendant's tubes.

We do not forget that the original applications of both the first and second patents provide for "focusing" the stream or jet;[6] and that did indeed presuppose a limited cross-section. However, there was nothing to indicate that the purpose of "focusing" was more than to turn those electrons into the path between the cathode and the anode which would otherwise escape the anode. That insured a greater electron density than unfocused "jets" would otherwise contain; but it did not intimate that the ratio of length to cross-section was an element of the invention. Moreover, it is not legitimate to use the figures accompanying an application to eke out an invention when the text does not describe the missing element; drawings "are of no avail where there is an entire absence of description of the alleged invention" in the specifications or claims.[7] Thus we should not be justified in taking the figures, even those accompanying the original specifications, to indicate that the ratio of length to cross-section was a part of the invention. And indeed in the case at bar it would do no good, if we were to resort to the figures, because, even though one were able to approximate the "critical point" of the anode, one would have no guide to the cross-section of the "jet"; for they tell nothing about that.

## Validity of the Claims as Limited

Since, as will appear, the defendant has not infringed the claims, limited as they must be, the question arises whether we are compelled to review Judge Galston's conclusion in favor of their validity. In what cases a court may dispose of a patent infringement action upon the issue of non-infringement, recent decisions leave in some doubt, we must own. In Electrical Fittings Corp. v. Thomas & Betts Co., 2 Cir., 100 F.2d 403, we held that, after deciding that a defendant did not infringe a claim, we need not pass upon a finding of the district court that it was valid. This we held because the finding had not been necessary to the judgment and for that reason would not be an estoppel, and would not therefore prejudice the defendant. The Supreme Court did not differ with us in thinking that the finding was immaterial, but nevertheless it directed us to strike it from the decree.[8] The rationale of that decision was that the defendant was entitled to have it out because, although it was not an estoppel, it might create some presumptive prejudice against him. It is to be noted that the court did not suggest that we were bound to review the finding, for that would have been inconsistent with its mere deletion. The case is therefore clearly a holding that it is not in all cases necessary to decide the issue of validity. In Cover v. Schwartz, 2 Cir., 133 F.2d 541, the district court had held that the claim was neither valid, nor infringed, and we dismissed the appeal because the patentee did not question the holding of non-infringement. We said that the unchallenged holding that the defendant had not infringed made the case moot, and ended our jurisdiction. That decision the Supreme Court cited with approval in Altvater v. Freeman,[9] saying that "to hold a pat-

6. Page 2, col. 2, lines 1-3 of the first patent; page 2, col. 1, lines 70-76, col. 2, lines 1, 2.

7. Permutit Co. v. Graver Corporation, 284 U.S. 52, 60, 52 S.Ct. 53, 55, 76 L.Ed. 1429; Typewriters Hilliardized, Inc. v. Corona Typewriter Co., 2 Cir., 43 F.2d 961, 964. Good Roads Co. v. Charles Hvass Co., 2 Cir., 70 F.2d 625, 627; Fox-boro Co. v. Taylor Instrument Co., 2 Cir., 157 F.2d 226; Hazeltine Research v. General Motors Corp., 6 Cir., 170 F.2d 6, 9.

8. 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263.

9. 319 U.S. 359, 363, 63 S.Ct. 1115, 1117, 87 L.Ed. 1450.

ent valid if it is not infringed is to decide a hypothetical case," relying on Electrical Fittings Co. v. Thomas & Betts, supra.[10] Unless there is some difference between a finding of invalidity and a finding of validity, Cover v. Schwartz should have ended with a direction to strike out the holding of invalidity, and perhaps the reason why we did not do so was that a counterclaim remained to be tried.

So the law stood when Sinclair & Carroll Co. v. Inter-Chemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644, was decided. There the district court had held that the patent was invalid and not infringed, and we had held it valid and infringed. This the Supreme Court reversed, holding the patent invalid, but not passing on the issue of infringement, which have of course become moot upon the finding of invalidity. However, it went out of its way to say, 325 U.S. at page 330, 65 S.Ct. at page 1145: "There has been a tendency among the lower federal courts in infringement suits to dispose of them where possible on the ground of non-infringement without going into the question of validity of the patent"; then, after citing Cover v. Schwartz with apparent approval, it added: "the District Court in this case followed what will usually be the better practice by inquiring fully into the validity of this patent." One court has read this as a direction always to decide the issue of validity[11] and perhaps it meant to go so far. However, if it did, it is hard to see how that was in accord with Electrical Fittings Co. v. Thomas & Betts, supra,[12] with Altvater v. Freeman, supra,[13] or with Cover v. Schwartz, supra,[14] which proceed upon the implied premise that the issue of infringement may be disposed of before that of validity, since it is only in that event that the issue of the validity can become "hypothetical," or "moot." The passage we have just quoted from Sinclair & Carroll Co. v. Interchemical Corp., supra,[15] was certainly not put in the form of a peremptory direction, but rather of a cautionary admonition, to be followed when that is the more convenient course; and it is thus that Woodbury, J., construed it in Grant Paper Box Co. v. Russell Box Co.[16] We are disposed so to understand it in the case at bar.

■ There are good reasons for allowing some latitude of choice. A decision resting upon non-infringement is generally much more secure than one on invalidity, at least when the question is whether there is a patentable invention. That issue is as fugitive, impalpable, wayward, and vague a phantom as exists in the whole paraphernalia of legal concepts. It involves, or it should involve, as complete a reconstruction of the art that preceded it as is possible. The test of invention is the originality of the discovery, and discovery depends upon the mental act of conceiving the new combination, for substantially every invention is only a combination. Nothing is more illusory, as nothing is more common, than to assume that this can be measured objectively by the magnitude of the physical readjustments required. Courts never tire, or at least in earlier times they never did, of expatiating upon the freshness of insight which observes a little, but fruitful, change which had theretofore escaped detection by those engaged in the field. When all is said, we are called upon imaginatively to project this act of discovery against a hypostatized average practitioner, acquainted with all that has been published and all that has been publicly sold. If there be an issue more troublesome, or more apt for litigation than this, we are not aware of it. The defence for always deciding it first, is that, if the claim be invalid, it should not be allowed to stand as a "scarecrow"; and that is quite true, granted the premise.

10. 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263.

11. Pennington Engineering Co. v. Spicer Mfg. Co., 6 Cir., 165 F.2d 59, 61.

12. 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263.

13. 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450.

14. 2 Cir., 133 F.2d 541.

15. 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644.

16. 1 Cir., 151 F.2d 886, 890.

Indeed, the same notion lies back of the disclaimer statute. But it must not be forgotten that the decision of a single court, whether district, or court of appeals, does not settle the question. It is the usual, if not universal, custom of practitioners if the stake is enough, not to rest content with a single decision of invalidity, but to seek another forum, as indeed the disclaimer statute permits.[17] A declaration of invalidity may therefore prove an *ignis fatuus,* as fictitious a security to those who wish to infringe the claim, as a declaration of validity may be a fictitious menace. We hold that it is open to a court to proceed as is most convenient, subject to the exception that, though the defendant has not infringed, claims may be so evidently invalid that the court should so declare. In the case at bar, we are by no means prepared to declare that Judge Galston was necessarily wrong in thinking that the claims in suit, limited as they must be to "long jets," are valid. The combination was concededly new; and, even against the background of the existing art, and of the short intervals by which the earlier inventions succeeded each other and preceded it, the combination may have been more than a step in a sequence sure to be realized. Indeed, the attack upon its presumptive validity has been chiefly directed to the claims as they were issued and not to the invention as it must be confined.

### Infringement

The distance from the last "screen" to the anode in the defendant's tubes ran from 2.75 millimeters to 4.4 millimeters. One tube was 2.75 millimeters; another 2.80; a third 3.25; a fourth 4.08, and the fifth and last, 4.4; and even though we were to take the tubes put in evidence by the plaintiffs as proper samples of the invention, the same distance was from 10.7 millimeters to 20, and the average was 13.5, nearly three times the length of the longest of the defendant's tubes. Moreover, if we look, as we must, to the original specifications, we find nothing definite. In the first patent a distance of two to three centimeters is suggested in one place (page 2, col. 2, lines 48, 49); later, it appears that one centimeter is too small, but that at three centimeters "the anode current will rise to a saturated value and at an anode voltage very much less than that of the accelerating electrode" (page 3, col. 2, lines 67–71). The statement that the "minimum" "breakdown point occurs when the anode is fairly close to the accelerating electrode" (page 2, col. 1, lines 44, 45), must not be read out of the context of the specifications as a whole. We of course recognize that in the case of an invention which, like this, consists in an *ad hoc* adjustment for each design of tube, specific dimensions cannot be expected; but, limited as the invention is to "long jets," it is fair to take the samples given as at least approximate illustrations. We can find no evidence in the record, as to the length of the "non-deflectable streams" with which Harries contrasted his "deflectable long jets"; but the burden was on the plaintiffs to show that the defendant's tubes were such "long jets," and they did not do so. In the case of the second patent the same distance is suggested for Figure 1, as in the case of the first patent "about 2 centimeters," (page 2, col. 1, lines 63, 64); although in the alternative (Figures 8 and 8a) described on page 2, col. 2, lines 8–46, the distance is somewhat less—13 millimeters—; and on page 3, col. 1, lines 49–56, the specification declares that "tubes made in accordance with the present specifications will not in general have as long a stream as many of those made" under the first patent. We cannot, however, agree that this meant that they were not to be "deflectable long jets" as Harries had deliberately declared them to be in contradistinction to the streams theretofore known to the art.

Indeed, even were we to allow the plaintiffs the benefit of the amended specifications, infringement was not proved, for it does not appear that the ratio of the length of the "jets" compared with their cross-sections in the defendant's tubes is as great as of those disclosed in the specifica-

17. Triplett v. Lowell, 297 U.S. 638, 56 S. Ct. 645, 80 L.Ed. 949.

tions. It is true that Harries prepared three diagrams of his tubes which showed the supposed length and width of the "jets" and that the ratios of length to width are comparable to the ratios of the defendant's tubes, as shown by diagrams also prepared by him. However, he appears to have taken the lengths of the patented "jets" from the figures alone, and the cross-sections from what he supposed these would be. After the amendments injected the element of ratio of length to cross-section, they nowhere, even in the final specifications, indicated what that ratio should be; and though we were to assume that it does not demand more experiment than that of which a routineer is capable, in order to determine the "critical distance" for the anode, taken as distance alone, it is conceivable that there may be added difficulties in determining "critical distance," taken as the ratio of length to cross-section. Finally, the question was one of fact, and Judge Galston found in his opinion that the defendant's tubes did not have "the ratio of cross-section of beam to length of stream such as Harries taught." We cannot say that the finding was "clearly erroneous."

Nor are we satisfied that Judge Galston's other finding was "clearly erroneous" that in the defendant's tubes the anode current does not become saturated at the "breakdown voltage point" of the anode. The specifications of neither patent defined the meaning of "substantially saturated"; the nearest approach to it is the phrase in the second patent: "the slope of the curves after saturation has occurred is small," (page 3, col. 1, line 1). The plaintiffs say that the meaning is to be gathered from the context; that it must be construed with an eye to the practical working of the tubes, and that it means that when the anode voltage reaches the "breakdown point," further rises will not "distort" the anode current enough to interfere with the proper output of the tube. Assuming that this is true, they are not entitled to a more favorable standard than that suggested by the defendant's witness, Herold: that increases of anode voltage shall set up only such variations in the anode current as "would make an almost negligible difference in the commercial salability or in the power output which you would measure on the tube." Herold was concededly a qualified expert in this field, and he set the limit of current variation, so defined, at between three and six per cent. Judge Galston in his opinion was "led to accept Herold's interpretation as being the practical one in the art"; and he therefore took six per cent as the limit of anode current variation after the "breakdown" point was reached. The question was of how the art understood the term, which was plainly a question of fact; and unless the finding was "clearly erroneous," we are to take this definition as controlling. It is an issue which we are altogether incompetent to decide upon the merits; even the terminology is beyond our acquaintance, and what actually takes place in the tubes is inaccessible except by its gross manifestations—indeed the very elements themselves are in dispute among those who have made them their life study, as the merest smattering of modern physics quickly discloses to a lay reader. While Congress sees fit to set before us tasks which are so much beyond our powers, suitors must be content that we shall resort to the testimony of experts, though they are concededly advocates with the inevitable bias that advocacy engenders. We see no reason to disturb Judge Galston's acceptance of Herold's testimony as to the understanding of this term of art.

There remains the question whether in the defendant's tubes the anode current is "substantially saturated," judged by this test. That depends first upon where the "breakdown point" is and in spite of all the talk about "sharp knees," the curves of the defendant's tubes do not display any "point" whatever; but a rather rounded curve. Thus there is considerable latitude in selecting the terminus a quo from which to measure variations in the anode current. We assume that the terminus ad quem is the "screen" voltage, although the curves on the graphs extend considerably beyond them. Upon that assumption and after making the fairest choice we can of the "breakdown point," the "top curve" for all the defendant's tubes shows much larger

variations than six per cent, except the curve for Tubes 35 A 5 and 35 L 6. Moreover six percent applies only to the "top curve" of those tubes, for the two next lower curves show three or four times as much. Once more, the record does not tell us whether it is only in the "top curve" that the percentage is important. The plaintiffs having the burden of proof upon infringement, failed to satisfy Judge Galston and that is enough to dispose of the issue.

Judgment affirmed.