**AMERICAN CYANAMID COMPANY,**
Plaintiff,

v.

**HERCULES INCORPORATED,**
Defendant.

**Civ. A. No. 2248.**

United States District Court
D. Delaware.

Oct. 26, 1966.

Alexander L. Nichols and Walter K. Stapleton, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., John T. Kelton, William H. Vogt, III, Stevan J. Bosses, Thomas V. Heyman, Watson, Leavenworth, Kelton & Taggart, New York City, and Evans Kahn, Stamford, Conn., of counsel, for plaintiff.

William S. Potter and Hugh L. Corroon, Berl, Potter & Anderson, Wilmington, Del., Ralph L. Chappell, Francis T. Carr, Kenneth E. Madsen, Richard L. Mayer, Kenyon & Kenyon, New York City, and Clinton F. Miller, Wilmington, Del., of counsel, for defendant.

## OPINION

CALEB M. WRIGHT, Chief Judge.

This is a civil action brought under 35 U.S.C.A. § 281 (1952) for infringement of a patent. Plaintiff, the American Cyanamid Company (Cyanamid), is the owner of United States Letters Patent No. 2,595,935 ('935) for "Wet Strength Paper and Process for the Production Thereof." The '935 patent issued to plaintiff on May 6, 1952 as the assignee of John H. Daniels, Jr., and Chester G. Landes. Plaintiff alleges the infringement of the patent by the defendant,

Hercules Incorporated (Hercules). Two defenses are raised—non-infringement and invalidity.

Cyanamid is a corporation existing under the laws of the State of Maine. Hercules is a Delaware corporation. Therefore, this Court possesses jurisdiction of the parties and issues herein. 28 U.S.C.A. § 1400 (1948).

The Court has concluded that the defendant's wet strength resin, Kymene 557, does not infringe the '935 patent, and on that ground alone would be disposed to enter judgment for the defendant. However, the Supreme Court has stated that the better course of action for District Courts to follow in patent suits of this nature is to ascertain the validity of the patent as well as any infringement or the lack thereof.

"There has been a tendency among the lower federal courts in infringement suits to dispose of them where possible on the ground of non-infringement without going into the question of validity of the patent. * * * It has come to be recognized, however, that of the two questions, validity has the greater public importance, * * * the District Court in this case followed what will usually be the better practice by inquiring fully into the validity of this patent." Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327 at 330, 65 S.Ct. 1143 at 1145, 89 L.Ed. 1644 (1945).

Mindful of the Supreme Court's admonition this Court has fully explored the question of the '935 patent's validity. The Court concludes that the '935 patent is invalid; the reasons for that finding will precede the Court's discussion of the infringement question.

## VALIDITY

The '935 patent is concerned with the art of wet strengthening paper, i. e., increasing its tensile strength when wetted. Normally paper loses most of its tensile strength when wetted. However, if the paper is impregnated with certain compounds its wet strength may be augmented. The '935 patent purports to disclose substantial improvements in the wet strengthing art.

To resolve the issue of validity it is of the utmost importance to view the '935 patent, and the purported innovations it discloses in the light of what was known about wet strengthening at the time of the invention. Specifically, it was known that wet strength could be augmented by treating paper with resin preparations, notably melamine-formaldehyde.[1] The melamine-aldehyde resins were added to the paper through two processes: tubbing or internal addition.

In the making of paper the first step is the preparation of an aqueous solution of pulp—slurry. Subsequently the slurry is processed until it is placed upon a screen where the actual formation of the paper sheet takes place. Once the sheet is formed, the paper is dried to extract the water. If the tubbing method of adding the resin is utilized the paper sheet is immersed in a vat which contains a colloidal solution of the particular resin to be employed. The newer internal addition method of impregnating the paper with the resin adds the colloidal solution of the resin to the slurry before the paper sheet has been formed. In both methods, the paper sheet is heated to remove any water which may remain, and to cure the resin to its water insoluble state. The internal addition process is a more efficient alternative which results in a more uniform application of the resin.

In order for a resin to be an effective wet strengthening agent suitable for addition to paper by the internal method it must be "substantive" to cellulose fibre; in other words, it must affix itself to the fibre in such a way that it becomes a part of the fibre, and not just a coating thereon. This substantivity is found in resins which are "cationic"— or positively charged. The melamine-aldehyde resins referred to above, which preceded the resins of the '935 patent,

---

1. United States Letters Patent No. 2,595,935, col. 1 & 2, Lines 37–50, 1–17 (1952).

possessed these properties. However, those resins also possessed significant disadvantages. Their successful application was dependent upon an aqueous pulp solution which was acidic. Further, the melamine-aldehyde resins possessed a high degree of sensitivity to sulfate ion which is commonly encountered in paper making.[2] This sensitivity to sulfate ion gave the resin a tendency to flocculate out of solution. Particularly disadvantageous was the requirement that the slurry be kept acidic since corrosion inevitably attended the wet strengthening process.

The '935 patent sought to remedy these defects by disclosing a resin which was cationic and hence substantive to cellulosic fibre but which possessed none of the disadvantages of previous resins. The principal objects of the patent were stated to be: 1. that the resin could be used with acidic, neutral or alkaline stock solutions; 2. that the resin have a decreased sensitivity to sulfate ions; and, 3. that the resin be curable under alkaline conditions.[3]

Specifically, the '935 patent discloses a resin which is obtained by condensing an alkylenepolyamine with a polyfunctional halohydrin. The alkylenepolyamines employed are exemplified by ethylenediamine, diethylenetriamine and tetraethylenepentamine. The halohydrins are obtained from glycerol; a halogen atom being substituted for a terminal hydroxy group. The terminal halogen atom imparts the essential cationic property to the resultant resin since it is highly susceptible to ionization. A polyfunctional halohydrin is one having two groups or radicals capable of promoting a reaction with an alkylenepolyamine. It is important that the halohydrin be polyfunctional because that insures a condensation product which is capable of cross-polymerization. The second combining radical may be another halogen atom—e. g., dichlorhydrin—or an epoxide group—e. g., epichlorhydrin—or any other atom or group which is reactive with amino nitrogen.

The Application for Letters Patent discloses 11 product claims and 4 process claims. Claim 1 is representative of the product claims:

"1. Paper having a uniform content of about 0.5–5% of its dry weight of a cured thermosetting alkylenepolyamine-polyfunctional halohydrin resin."

Claim 12 fairly represents the process claims:

"12. A process for the production of cellulosic products of increased wet strength which comprises adding to an aqueous suspension of cellulosic paper stock an uncured thermosetting alkylene-polyamine-polyfunctional halohydrin resin, adsorbing about .1% to 5% of said resin on said paper stock, forming the stock so treated into a waterlaid cellulosic product, and curing the resin to its heat-set and water insoluble condition by heating said waterlaid product for about 1 to 4 minutes at temperatures between 300° and 212° F. and thereby forming a bond of cured resin between the cellulosic fibres thereof."

The defendant, Hercules, attacks the validity of the patent on two grounds. First, it contends that the patent was not patentable over the prior art. The defendant, in pressing this argument, places major reliance on French patent number 884,271 issued April 19, 1943 to I. G. Farbenindustrie Aktiengesellschaft, Germany. Second, the defendant urges that the patent embraces no patentable invention since the disclosures of the patent were obvious to anyone skilled in the art. With this second argument the Court agrees; therefore, the question of the French patent's preemption of the field becomes moot.

Initially Cyanamid, in urging the patentability of the claims disclosed in the '935 patent, took the position in the pat-

2. T.R. 86–87.

3. '935 Patent, col. 2, lines 18–36.

ent office that the compounds whose preparation was taught by the patent constituted a new class of chemical compounds:

> "It follows, therefore, from the facts pointed out above, that the present invention applies to paper a *new class* of compounds that have not heretofore been prepared for any purpose." DX

1, File Wrapper '935 Patent, p. 24. However, in the instant proceedings the facts do not substantiate the plaintiff's contention that the '935 resins constitute a new class of compounds. Dr. Daniels, a co-patentee, stated that the resin had been isolated and used by others in Cyanamid. He also stated that he had obtained the resin from Cyanamid's Ion Exchange Laboratory.[4] The resin he obtained from the laboratory was called Ionac A–300, and had been invented by Drs. Dudley and Lundberg who subsequently procured patents covering the resin.[5]

Nor does Cyanamid currently contend that its invention consists of the discovery of a new process of applying resins to paper. Especially in the light of its own prior practice of using melamine-formaldehyde resins for wet strengthening paper, and the similar processes used to effect the addition of these resins to paper stock, plaintiff concedes this point.[6]

Rather, plaintiff's contentions of invention are bottomed upon its arguments that the application of Ionac A–300 to paper to promote wet strength was not obvious and that the discovery of a resin which could be used under alkaline conditions represented a significant advancement in the art. In part this second argument relies on the first, since once the resin was applied to paper as a wet strengthening agent, the alkaline-curing features of the resin would be apparent.

To sustain its first argument that the application of Ionac A–300 to promote wet strength was not obvious, Cyanamid relies heavily upon Application of Maxwell, 188 F.2d 479. Maxwell held that the application of a resin invented by someone other than the patentee to paper for the purpose of wet strengthening it was a patentable invention. In Maxwell, however, there was a distinct factual difference which compelled a result not warranted here. There, as here, the resin had indeed been discovered by a third party; but, the inventor of that resin had not realized its applicability to the paper-making process. The Maxwell patentees claimed that they had discovered the reaction between the resin and paper stock; a reaction which was neither obvious to nor foreseen by the resin's inventor.[7]

In the case of the '935 patent the situation was different. Maxwell and Landes had already done much of the groundwork, discovering the chemical reaction between cationic resins and cellulose fibre. Given the disclosures of the Maxwell and Landes patent, all the "inventor" had to do in the present case was to select a resin which fitted the generic description of the resins used by Maxwell and Landes so that their chemical reaction could be duplicated. The fact that the resins which the '935 patentees employed proved to be more effective than those used by Maxwell and Landes does not alter the fact that the trail had been blazed by earlier work showing the chemical reaction between cationic resins and cellulosic fibre. The correctness of this conclusion regarding the significant role the Maxwell and Landes discovery played in the development of the '935 patent is buttressed by the fact that Landes

---

4. DX 8, Deposition of Dr. Daniels, 105.

5. DX 5, United States Letters Patent No. 2,469,683.
   DX 6, United States Letters Patent No. 2,469,692.

6. Plaintiff's Brief, p. 3.

7. 188 F.2d at 482.

is a co-patentee of the '935 patent. Significant too is the fact that contrary to the situation in the Maxwell and Landes application Dr. Dudley, the inventor of the resin Ionac A–300, foresaw its utility as a wet strengthening agent for paper.[8] As early as 1943, three years before the '935 application was filed, and two years prior to Dr. Daniels' research,[9] Dr. Dudley noted:

> "Not only may the resinous materials described here be used as anion exchange resins [cationic], but they may also be used for the treatment of textiles and paper to impart stiffness, wet strength, etc., and as dye assistants. For applications such as these, the reactants may be partly condensed to form water soluble materials which may be applied in aqueous solution to the desired object and further treated to render the resin insoluble." DX 157, p. 152.

Maxwell held that the discovery of the chemical reaction between melamine-aldehyde resins and cellulosic fibres was patentable. The '935 patent claims no substantially different chemical reaction. Essentially, the chemical reactions are identical, and the '935 patent merely represents an effort to use the chemistry taught by Maxwell in combination with more effective resins.

For many years the courts have grappled with the problem of precisely delineating the scope of the word "invention." The fruit of their efforts has been the gradual realization that the term is inherently imprecise. Judge Learned Hand succinctly summarized the problem:

> "After all that has been written, and will be of any tests of invention, there must always remain some latitude which is not susceptible of nice rational analysis. The standard is too imprecise to permit of strictly deductive application * * *" Scott & Williams, Inc. v. Aristo Hosiery Co., 300 F. 622 (S.D.N.Y. 1924).

■ Recently the "invention" standard was embodied in statute, but the statutory language does little to relieve the quandary of those who seek a precise exposition of the standard courts are to apply in adjudging the validity of a patent.[10] Section 103, which puts the test in terms of the "non-obviousness" of the proffered invention, was intended by its framers to be a codification of the existing common law "invention" standard whose imprecision Judge Hand found so odious.[11]

The common law foundation of Section 103 dates from 1851, and the celebrated case of Hotchkiss v. Greenwood, 11 How. 248, 52 U.S. 248, 13 L.Ed. 683. In Hotchkiss the patentee claimed a patentable invention in his discovery of the utility of potter's clay or porcelain as materials

8. The Court's statement that Dr. Dudley foresaw the use to which Ionac A–300 could be put should not be taken as a finding that Dr. Dudley communicated this conclusion to Dr. Daniels. Had Dr. Dudley communicated his knowledge in this regard directly to Dr. Daniels that would be the end of the matter for the "invention" would then clearly be that of Dr. Dudley. Rather the Court is merely indicating that the inventor of the resin foresaw its utility as a wet strengthening agent, and using the foresight as a buttress for its argument that Dr. Daniels' "discovery" was an obvious one given the properties of the resin.

9. DX 127, Dr. Dudley's Laboratory Notebook, p. 191.

10. "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made." 35 U.S.C.A. § 103 (1952).

11. Graham v. John Deere Co., 383 U.S. 1, 16–17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

for the manufacture of door handles instead of the customary woods. The Supreme Court sustained a lower court instruction that if the patent merely involved the substitution of the superior materials disclosed in a known process, then it was invalid for want of invention. The Supreme Court laid down the general rule:

"The improvement consists in the superiority of the material, and which is not new, over that previously employed in making the knob.

But this, of itself, can never be the subject of a patent.  *  *  *

The difference is formal, and destitute of ingenuity or invention. It may afford evidence of judgment and skill in the selection and adaptation of the materials in the manufacture of the instrument for the purposes intended, but nothing more.

*  *  *  *  *  *

[U]nless more ingenuity and skill . . . were required . . . than were possessed by an ordinary mechanic acquainted with the business, there was an absence of that degree of skill and ingenuity which constitute essential elements of every invention. In other words, the improvement is the work of the skillful mechanic, not that of the inventor." 52 U.S. at 266–267.

■ Generally, the substitution in a known process or compound of superior for inferior materials does not reach the height of patentable invention.[12] The cases are legion; representative is Sinclair & Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L. Ed. 1644 (1945). In Sinclair the inventor of a patented ink, in an effort to sustain his patent, detailed his inventive efforts substantially as follows: He sought an ink which would remain liquid at room temperatures, yet dry at 150° C. The vital ingredient was the solvent which had to possess negligible vapour pressure at room temperature and high

vapour pressure at 150° C. These requirements had been set forth in detail in an article published by one Hanson. With the Hanson requirements in mind the patentee merely perused a list of a chemical supplier until he discovered such a solvent. The Supreme Court thought his conduct "mechanical." Finding an insufficient contribution to society not warranting the reward of patentability, the Court invalidated the patent.

"Reading a list and selecting a known compound to meet known requirements is no more ingenious than selecting the last piece to put into the last opening in a jig-saw puzzle. It is not invention." 325 U.S. at 335, 65 S.Ct. at 1147.

■ With this general precedent in mind the Court turns to the specific application of Section 103's criteria to Daniels' efforts. In applying Section 103 the Supreme Court has directed the District Court to proceed as follows:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined." Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

Reviewing the present case discloses the obviousness of the claims of the '935 patent. The prior art taught the use of melamine-aldehyde resins as wet strength agents. Maxwell and Landes had discovered the chemical reaction between cationic resin preparations and cellulosic fibre which made those resins substantive to the paper. Furthermore, the resin used in the '935 patent, polyalkylenepolyamine-polyfunctional halohydrin, had been uncovered by researchers other than the '935 patentees. In sum, the earlier work of Maxwell and

12.  2 Walker, Patents § 112 (Deller Ed. 1964).

Landes demonstrated the necessary properties which a successful wet strengthening agent must possess. Ionac A–300, a resin possessing all of these properties existed. The essence of the '935 patent was simply the realization that Ionac A–300 fulfilled the Maxwell and Landes criteria.

It is urged that the '935 patent is not obvious since it teaches a resin which will cure under alkylene conditions and which operates under alkylene conditions. However, these properties are insufficient to render the '935 patent "non-obvious" since they are inherent in the resin and are not the result of an improved application thereof. Once the resin was used for wet strengthening, these alkaline features would become obvious to any skilled chemist.

The present fact situation is analogous to the Hotchkiss and Sinclair cases discussed above. What Dr. Daniels did in the present case was to read the available literature, including Cyanamid's, and discover the existence of Ionac A–300, a thermosetting, cationic, wet strengthening resin. He procured a partially cured specimen of this resin and applied it in accordance with the teachings of Maxwell and Landes. The fact that Ionac A–300 was an effective wet strengthening agent was already known at Cyanamid.

Like the Sinclair and Hotchkiss inventors, Daniels' behavior was mechanical; he merely applied the innovations of other chemists. That his application proved more successful cannot suffice to confer patentability upon an obvious discovery. There is nothing taught by the '935 patent which is not obvious in the wake of earlier discoveries made by other chemists.

For these reasons the Court finds the '935 patent invalid.

## INFRINGEMENT

Before embarking upon an examination of the evidence which compels the conclusion of non-infringement, a few elementary points merit reiteration. First, it is settled law that the burden of proof in patent infringement cases is upon the plaintiff.[13] Second, the '935 patent is a "paper patent," one that has never been commercially exploited. Traditionally the courts have looked askance upon efforts to enforce paper patents, developing the doctrine that they are to be strictly construed.[14]

The plaintiff's patent discloses a process for wet strengthening paper. The resins utilized are said to be those obtainable by condensing an alkylenepolyamine with a polyfunctional halohydrin.[15] The patent describes the alkylenepolyamines used in preparing the resins as "well-known compounds corresponding to the formula $H_2N(C_nH_{2n}HN)_xH$ in which x is one or more,"[16] and with more specificity sets forth examples of typical amines falling within the generic description.[17]

The defendant's specifications for the manufacture of Kymene 557 disclose a somewhat different process.[18] In contrast with the plaintiff's one step process involving two reagents, the defendant's process has two distinct steps. First an alkylenepolyamine—DETA—is reacted with adipic acid to form a long chain

13. E. g., Harries v. Air King Products Co., 183 F.2d 158 (2 Cir. 1950).

14. See cases cited at note 32, infra.

15. '935 Patent, col. 2, lines 37–43, col. 3, lines 39–45.

16. Id., col. 3, lines 17–21.

17. Alkylene diamines such as ethylenediamine and 1, 3 propylenediamine and

polyalkylenepolyamines such as diethylenediamine, triethylenediamine, tetraethylenepentamine and the corresponding polypropylenepolyamines and polybutylenepolyamines.

18. PX 32. The other resins sold by defendant, Kymene 660 and Kymene 709 are simply more concentrated versions of Kymene 557. Hereinafter these resins will be collectively referred to as Kymene 557.

polymer which the defendant calls Polymer 567. In the second step Polymer 567 is reacted with epichlorohydrin to form Kymene 557.[19]

Although the defendant's process employs an alkylenepolyamine as one of the reagents, the alkylenepolyamine is not reacted with epi as the '935 patent specifies. Instead, the defendant uses the polyalkylenepolyamine to construct a polyaminoamide which is subsequently reacted with epi.

Since the claims of the '935 patent extend to the condensation product of a polyalkylenepolyamine with a polyfunctional halohydrin, and since the term polyalkylenepolyamine is specifically defined, the relevant line of inquiry is whether Polymer 567, which the defend-

ant reacts with a polyfunctional halohydrin, is embraced by the patent's definition of a polyalkylenepolyamine.

By any applicable test there is no equivalence between the generic description "alkylenepolyamine" and Polymer 567. The formula for a polyalkylenepolyamine is said to be $H_2N(C_nH_{2n}HN)_xH$. Employing a similar notational system the formula for Polymer 567 would be $H_2NC_2H_4NHC_2H_4NH[C_{10}H_{16}O_2(NH)_3]_xH$, where "x" equals one or more. In diagram form the difference is even more astounding. As representative of polyalkylenepolyamines the Court has selected tetraethylenepentamine—TEPA. The location of the amino nitrogen atoms, the situs of the reaction with epichlorohydrin molecules, has been highlighted by double underscoring.

## Tetraethylenepentamine

## Polymer 567 [20]

19. *Ibid.* See also T.R. 192–220.

20. The formula diagrammed below the designation "Polymer 567" is not a representation of what an actual individual molecule of the polymer would look like. It is a representation of what a segment of Polymer 567, selected at random, would look like. The diagram is being used for explanatory purposes only. It has been selected to show the different spacing of the amine groups as contrasted with TEPA.

The vital atoms in each of these molecules are the amino nitrogens—indicated by a double underscoring. The epi reacts with each of these molecules at the site of the underscored atoms to form either pendant epichlorohydrin residues, cross-linking, or, in the case of Polymer 567, azetidinium chloride rings.

An examination of these molecules discloses several discrepancies. Tetraethylenepentamine has four amino nitrogens, Polymer 567 only two. TEPA has but two atoms in the chain separating the reactive amino nitrogens; Polymer 567 has twelve such atoms, ten carbon and two nitrogen. Finally, TEPA has a molecular weight of 189 whereas the lowest molecular weight found for Polymer 567 was about 3,000.[21]

Most salient of these differences is the variation in geometrical configuration. The spacing of the amino nitrogens determines the structure of the resultant resin since cross-linking can only occur at the site of those atoms. If the amine groups are close together, then the resin will be closely cross-linked, a dense molecular structure. If, on the other hand, the amine groups are spaced quite far apart, as in the case of Polymer 567, then the resultant resin will be loosely cross-linked. Among the examples set forth in the '935 patent, the greatest spacing between amine groups occurs in the butylaminepolyamines; but even there the spacing is only four carbon atoms. Necessarily this difference in geometry will significantly alter the characteristics of the resins in such areas as water solubility, chemical functionality, and their ability to react and interact with cellulosic material.[22]

Concededly, it is possible to construct a polyalkylenepolyamine which would space the amine groups with twelve carbon atoms—dodecalynepolyamine. However, this compound would be water insoluble, and therefore worthless as a backbone for wet strength resins.[23] The reason that Polymer 567 remains water soluble despite the presence of the twelve atom spacing is that it also contains amide nitrogen groupings which promote water solubility.[24]

Another significant difference between Kymene 557 and the resins of the '935 patent is the presence in the former of significant amounts of tertiary and quaternary amino nitrogen.[25] In the case of the '935 patent, the resins contain a high degree of secondary nitrogen which is inconsistent with the presence of quaternary nitrogen. Quaternary or pentavalent nitrogen is created either through cross-linking or through the formation of azetidinium rings. These rings are formed by pendant epichlorohydrin residues. The chlorine atom breaks away, becoming an ion, and its neighboring carbon bonds with the same nitrogen atom from which the epichlorohydrin residue is pendant. The azetidinium chlorine formations are highly reactive with cellulosic material; they form covalent bonds with the oxygen atoms. Their presence in Kymene 557 explains in part the efficiency of that resin as a wet strengthening agent.[26]

A final difference between the process involved in the '935 patent and the preparation of Kymene 557 is the molecular ratio of the reagents employed in the preparation of the respective resins. The '935 patent teaches an optimum mol

21. TR. 918, 1011.

22. T.R. 918–20, 926–29.

23. T.R. 933–38.

24. Ibid.

25. There are three basic types of amino nitrogen; primary, secondary and tertiary. Nitrogen has three valences. When two of these valences are saturated with hydrogen atoms, the amine is primary; when one valence is saturated with hydrogen, the amine is secondary; and if none of the valences are saturated with hydrogen the amine is tertiary. Quaternary nitrogen is an unusual form of nitrogen which has four bonds; when that occurs, the nitrogen takes on a positive charge. See T.R. 857, 990–91.

26. Tr. 861–67, 900, 944–49.

ratio of between 2:1 and 3:1 epi to tetraethylenepentamine. The preparation of Kymene 557 utilizes a ratio of 16:1, epi to Polymer 567.[27] The '935 patent teaches deleterious consequences if the ratio exceeds 4:1, whereas the evidence demonstrated that lowering the epi-Polymer 567 ratio below 16:1 would diminish the resin's effectiveness.

Further support for the proposition that Polymer 567 is not a polyalkylenepolyamine and that Kymene 557 does not infringe the '935 patent may be deduced from the history of the plaintiff's efforts to develop a product which would be competitive with Kymene 557. The initial reaction of plaintiff's research department when requested by the sales department to develop a competitive substitute was that it had "no ideas of a product that would be competitive with Kymene S-557;"[28] this despite the fact that it had the teachings of the '935 patent before it. Starting in late 1957 and continuing through 1960, the plaintiff engaged in an extensive research program with the dual purpose of identifying the composition of Kymene 557 and developing a substitute. Cyanamid's efforts bore fruition in PP 2424. The wet strength of this resin was the same as Kymene 557, but that was not astounding since the two were chemically indistinguishable.[29] More interesting is the fact that PP 2424 was developed independently of the teachings of the '935 patent. None of the employees in plaintiff's research laboratory thought PP 2424 to be related to the '935 resins. In fact, plaintiff's own scientists referred to PP 2424 as a "polyamide cross-linked with epi."[30]

Although the Court, for the reasons heretofore stated, is convinced that the '935 resins and Kymene 557 are so chemically dissimilar that Kymene 557 cannot infringe the '935 patent, it would be remiss not to direct attention to the relative commercial success of the '935 resins and Kymene 557. Since its commercial debut Kymene 557 has been a phenominal success. In the first year Hercules marketed 7 million pounds of Kymene 557; sales increased dramatically until a volume of 70 million pounds was attained in 1964. Gross sales in the seven year period 1958–64 were 17 million dollars.[31] By way of contrast, the resins of the '935 patent were unsuccessful; no effort to exploit them commercially was ever made. As Hercules' resin grew in popularity many of Cyanamid's customers pressed for a similar product, but none of the '935 resins could satisfy the demand.

The plaintiff's non-use of the '935 patent, and the defendant's corresponding success with Kymene 557 brings to mind an established line of patent cases which holds that paper patents should not be permitted to blanket an industry, forcing the manufacturer of a commercially successful product to pay tribute.[32]

The *Berry* case contains an excellent restatement of the doctrine. There the plaintiff was the owner of a patent covering the continuous vacuum distillation of petroleum products. The defendant in 1926 marketed a commercially successful distillation unit, and in 1929 the plaintiff, in a renewal application, sought to specifically encompass the defendant's product by altering the general language of the patent. The amendment to the claims of the patent was permitted, and the plaintiff instituted an infringement action. In addition to finding the amendment of the patent improper, the Court

---

27. '935 Patent, col. 4, lines 53–63; T.R. 1012–13.

28. DX 151.

29. DX 90, pp. 9918–20, 9941–43.

30. DX 106, 107.

31. T.R. 1169–70.

32. Standard Oil Development Co. v. James B. Berry Sons Co., 92 F.2d 386 (3 Cir. 1937); Roberts v. General Electric Co., 85 F.2d 964 (3 Cir. 1936); Elvin Mechanical Stoker Co. v. Locomotive Stoker Co., 286 F. 309 (3 Cir. 1923); Berghane v. Radio Corp. of America, 116 F.Supp. 200 (D.Del.1953), aff'd, 217 F.2d 490 (3 Cir. 1954); Lanova Corp. v. National Supply Co., 30 F.Supp. 742 (W.D.Pa. 1939), aff'd, 116 F.2d 235 (3 Cir. 1940).

embraced the doctrine disfavoring paper patents:

"[Since] 'no single unit or combination of units, as described in the specifications of the Loomis patent, have ever been put into commercial use,' it will be seen that the alleged invention of the patent did in truth and fact in no way promote the progress of the refining art. * * * [This is] a case where a court should not blanket an industry by enforcing a nonuse patent. * * * 'It would * * * be grossly unfair to compel the builder of a practical working machine to pay tribute to one who has added nothing of substantial value to the art, simply because the language of his claims is broad enough to include the successful structure.'" 92 F.2d at 387–388.

The *Berry* case is remarkably similar to the present case where the plaintiff would have the Court redefine polyalkylenepolyamine to include the defendant's polyaminoamide. The defendant discovered an intermediate step, the reaction of DETA with adipic acid, which enhanced the end product's wet strengthening capabilities. To permit the '935 patent to embrace defendant's successful and chemically dissimilar Kymene 557 resin would be to dishonor Judge Buffington's astute caveat in the *Berry* case. This the Court is unwilling to do.

For the reasons herein stated, the Court finds the '935 patent to be invalid and not infringed by Kymene 557.[33]

The foregoing opinion is adopted as the Court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52 (a), 28 U.S.C.A.

Let an appropriate order in conformity herewith be submitted.

[33]. The record contains much testimony tending to show the defendant's participation in mill trials of Kymene 557. From this evidence the plaintiff seeks to cast defendant in the position of a joint tortfeasor in the infringement of the '935 patent. Also, plaintiff has alleged that defendant actively induced infringe-

ment. Since the Court has concluded that Kymene 557 does not infringe the '935 patent, there is no reason to consider whether defendant's acts in promoting its sale amount to direct or contributory infringement, or whether defendant is a joint tortfeasor.