Vernon K. **CHARVAT**, Appellant,

v.

**COMMISSIONER OF PATENTS.**

No. 71–1731.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 26, 1972.

Decided June 28, 1974.

MacKinnon, Circuit Judge, dissented and filed an opinion.

———◆———

Armand P. Boisselle, Jr., Spartanburg, S.C., with whom Donald D. Jeffery, Cleveland, Ohio, was on the brief, for appellant.

Fred W. Sherling, Associate Sol., U.S. Patent Office, with whom S. William Cochran, Sol., U.S. Patent Office, was on the brief, for appellee.

Before DANAHER, Senior Circuit Judge, and MacKINNON and ROBB, Circuit Judges.

PER CURIAM:

■ Like others[1] before him who have presented an issue as to obvious-

---

1. *See, e. g.,* Pro-Col Corporation v. Commissioner of Patents, 141 U.S.App.D.C. 142, 436 F.2d 296, 297 (1970) and cases cited. Emerging conclusively is the principle that

ness in patent litigation, Charvat has here contended that there was error in the rejection of his application Serial No. 304002 for a grinding wheel. The Patent Office and the District Court concluded that Charvat's Ramron wheel would have been obvious to one possessed if ordinary skill in the art in light of a single reference, that of Tocci-Guilbert who already possessed U.S. Patent No. 3,252,775 covering a polishing wheel. Protracted exchanges of views among the members of this sitting division only have emphasized that what is "obvious is not a question upon which there is likely to be uniformity of thought in every given factual context." Graham v. John Deere Co., 383 U.S. 1, 18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). The difficulties in these situations must be resolved on a case-by-case basis. *Id.*, 18, 86 S.Ct. 684.

The Court in *John Deere* recognized that there is a notorious difference between the *standards* applied by the Patent Office and by the court, adding: "While many reasons can be adduced to explain the discrepancy, one may well be the free rein often exercised by Examiners in their use of the concept of 'invention.'" *Id. And see* Kewanee Oil Co. v Bicron Corp., 416 U.S. 470, 488–489, 94 S.Ct. 1879, 1889, 40 L.Ed.2d 315 (May 13, 1974).

In the instant situation, the tribunals of the Patent Office were well aware that the prior art included various means for the production of grinding wheels but nevertheless allowed the Tocci-Guilbert patent expressly designed by the patentee for use in the polishing art. The District Court, for its part, seems to have misconstrued the degree of difference between Charvat and all prior art and quite clearly to have ignored factors established at trial through un-

contradicted evidence which had not been before the Patent Office.

In this state of the record, we should note at once that Charvat already had been granted a patent on the *process* for the construction of his Ramron wheel. In determining how to approach the present issue, arising under 35 U.S.C. § 103, concerning his product claims, we turn again to *John Deere, supra,* where, at 17–18, 86 S.Ct. at 694, we are instructed:

[T]he scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.[2]

We will hereinafter discuss in detail the processes and the structures involved, having in mind particularly the differences between Charvat's disclosures and those apparent from the Tocci-Guilbert patent, the only reference cited by the Patent Office as defining the prior art. What emerges here is a combination of disparate elements already known to the art. From Tocci-Guilbert, Charvat could perceive the use of plastic resins and the notion of foaming to achieve uniform dispersal of the abrasive. Then came his centrifuging, entirely lacking in Tocci-Guilbert. From the prior art of grinding wheels, he could have taken the idea of clustering the grains at the perimeter of the wheel. His combination was not at all

---

we may not disturb the findings of the Patent Office and of the District Court unless we possess the "thorough conviction" that error has been committed. Even so, the ultimate question of patentability is one of law, Great Atlantic & Pacific Tea Co. v. Su-

permarket Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

2. *And see* Higley v. Brenner, 128 U.S.App. D.C. 290, 387 F.2d 855, 858 (1967); *see also* L-O-F Glass Fibers Co. v. Watson, 97 U.S.App.D.C. 69, 228 F.2d 40 (1955).

made obvious by the prior art. Not only had Tocci-Guilbert never claimed a wheel such as Ramron, he purposefully sought to disclose a polishing wheel. Charvat on the contrary combined his centrifuging process with all other elements so as to set a novel grain configuration which produced his grinding wheel far superior to any known.

■ To the foregoing general observations as to just what is involved, we may add one additional criterion. The Court has emphasized that while the claims of a patent limit the invention and specifications are not to be utilized to *expand* the patent monopoly, "it is fundamental that claims are to be construed in light of the specifications and *both are to be read with a view to ascertaining the invention*". United States v. Adams, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966). (Citations omitted) (Emphasis added). Put another way, the Court's discussion does not forfend against our narrowing the extent of patentability. Here the prior art disclosed other grinding wheels. Tocci-Guilbert disclosed the process and the structure of polishing wheels. Even though such elements were well known in the prior art, Charvat, like Adams, has presented us with a new combination which is entitled to recognition. Justice Clark, speaking for the Court, surely has authorized us to take the approach to be developed in light of the record before us. He made it clear that "known disadvantages in old devices which would naturally discourage the search for new inventions may be taken into account in determining obviousness". United States v. Adams, *id.* at 52, 86 S.Ct. at 714.

After extensive consideration of all aspects of this case as to the facts and applicable legal principles, we conclude

with "thorough conviction" that we must reverse the District Court. "Processes, machines, manufactures, compositions of matter and improvements thereof, which meet the tests of utility, novelty, and nonobviousness are entitled to be patented . . . ". Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 483, 94 S. Ct. 1879, 1887, 40 L.Ed.2d 315 (Sl. Op. 12, May 13, 1974). We are satisfied further that Charvat has complied with the requirements of 35 U.S.C. § 112, and hence is entitled to a patent on his Ramron grinding wheel.

## I.

## THE NON–OBVIOUS NATURE OF APPELLANT'S CLAIMS

■ It is fundamental that an applicant may not be entitled to a patent if his claims are so similar to the prior art that they would be "obvious . . . to a person having ordinary skill in the art". 35 U.S.C. § 103. It does not follow that the mere existence of the basic teachings in the prior art will render obvious a new claim combining such teachings. Courts have long since held that

. . . even if all of the elements used are old, a new result, an unexpected result, a far more efficient result, or a more economical result will satisfy the requirements of patentability.[3]

Thus, in Blaw-Knox Co. v. I. D. Lain Co.[4] the court validated a patent consisting solely of elements old in the art because the patentee had solved a problem that previously had inhibited use of the particular product.[5]

■ A claim that combines prior art elements can embody sufficient invention to be patentable, if the claimed invention represents "progress" from the

3. Higley v. Brenner, 128 U.S.App.D.C. 290, 387 F.2d 855, 858 (1967). *See also* The Barbed Wire Patent, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1891); Corning Glass Works v. Brenner, 152 U.S.App.D.C. 262, 470 F.2d 410, 420 (1972).

4. 230 F.2d 373 (7 CA 1956), *cited in* Higley, *supra* note 2, 387 F.2d at 859.

5. *See also* Colgate-Palmolive Co. v. Carter Products, Inc., 230 F.2d 855 (4 CA 1956), and Higley, *supra* note 2.

prior art.[6] Clearly, we must, in every such case, undertake a careful inquiry as to whether or not such combination patents should be allowed. We are quite aware, as previously noted, of the factors involved and the steps to be taken in achieving our determination of whether the claim is obvious and non-patentable,[7] or non-obvious when measured in terms of ordinary skill in the art. Thus it is the Supreme Court has indicated the availability of secondary tests which appropriately may govern disposition of close cases.[8] These tests include whether the claimed invention has enjoyed commercial success or satisfies a long felt commercial need. As we have found in the past, these secondary tests can be quite helpful:

> Evidence of a long standing need tends to indicate nonobviousness, because otherwise the need would not have persisted in the face of efforts directed toward solution. Potential commercial success, it is inferred, would probably have induced innovators to make such efforts. Evidence that the applicant's device has had commercial success tends to indicate that the other efforts were unsuccessful. Taken together, the evidence of a

need and of success where others had tried and failed tends to show that the successful solution was not obvious.[9]

### A. Appellant's Claimed Invention

Let us first describe what occurs in the production of a Ramron wheel and then pass to other aspects to be considered here.

Appellant's claimed invention is a uniquely structured abrasive wheel designed for use in high-speed grinding. As stated in the Charvat application,

> [a] grinding wheel, in contrast to a polishing or finishing wheel, is capable of making a cut of substantial depth in a workpiece which may be of cast iron or steel . . .[10]

Abrasive wheels, such as Charvat envisions, consist of small abrasive grains bound together by a resin of some description. There exist a large variety of both grains and resins, and different wheels will employ these in varying proportions and conformations according to the needs of the user. Appellant claims a wheel in which the abrasive material is bound together by a rigid, but non-brittle polyurethane resin, and in which the abrasive grains are spaced slightly apart from each other.[11]

---

6. Commissioner of Patents v. Deutsch Gold-Und-Silber-S., Inc., 130 U.S.App.D.C. 95, 397 F.2d 656, 666–667 (1968).

7. See Higley v. Brenner, supra, note 2, 128 U.S.App.D.C. 290, 387 F.2d at 857–858 (1967).

8. Graham v. John Deere Co., supra, 383 U.S. at 17–18, 86 S.Ct. 684. A full discussion of these "secondary" tests may be found in Note, Subtests of "Non-obviousness:" A Nontechnical Approach to Patent Validity, 112 U.Pa.L.Rev. 1169 (1964).

9. Higley v. Brenner, supra note 2, 387 F.2d at 859.

10. On the other hand, the Patent Office cited as its sole reference the Tocci-Guilbert patent, the application for which outlined the inutility of "coated abrasives", page 1, column, 1, lines 30–55.

11. Charvat's Claim 1 was dropped after adverse Patent Office action. Claims 2–5 and 38–47 were rejected as obvious in light of Tocci-Guilbert. Additionally Claims 38–40

and 42–48 were rejected under 35 U.S.C. § 112. See note 22, infra re same.

For present purposes we set forth Claim 2 as representative of the first group.

2. A grinding tool comprising an essentially rigid, dimensionally stable body of cellular polyurethane resin binder selected from the group consisting of aromatic polyether polyurethanes and aromatic polyester polyurethanes and granular abrasive dispersed uniformly embedded therein, the grains comprising such abrasive being spaced only slightly apart and said resin being capable of slight local stubborn resilient yielding action to an extent allowing corresponding slight local individual movement of said grains exposed at the tool face relative to other adjacent grains in such face, but said body as a whole being sufficiently rigid to support the grinding face of said tool and to make a grinding cut of precise predetermined depth under operating pressures in use, such slight local yielding action of said resin at such grinding face being sufficient to ensure readjustment of the positions of individual grains

Appellant's wheel structure is formed by mixing the abrasive material with the resin in a wheel-shaped mold. Once these constituents are mixed, Charvat calls for *centrifuging* the combined resin and abrasive, a step never mentioned or even suggested by Tocci-Guilbert. The centrifuging procedure forces the abrasive grains to pack against the outer surface of the mold. Ultimately the grains are left in a tight configuration, with a small amount of resin in the interstices of the grains. Next, there is a brief period in which the resin "foams", spreading the grains slightly apart. When the grains have spread approximately "one grain diameter" apart, the foaming is interrupted and the mixture is gelled. Gellation locks the grains in place in the tiny "sockets" formed by the polyurethane resin that fills the grainwide interstices of the abrasive grit.

As a result of the use of a stiff plastic resin, and of the slight spreading of the abrasive grains, appellant claims a wheel which is essentially *rigid*. Its individual abrasive grains are exposed at the working face of the tool and are slightly spaced apart and capable of individual adjustment relative to each other. They retain their position in the binder and can accept the high pressures imposed on the individual exposed grains.[12]

So structured, this wheel appears to have two qualities that make it unique among grinding wheels. First, the wheel is quite strong. This allows use of the wheel on high horsepower grinding machines on which the wheel turns at very high speeds. Indeed, it appears that Charvat's "Ramron" wheel can safely be run at high speeds up to nearly twice the surface feet per minute of conventional grinding wheels.[13] A second unique quality of appellant's wheel is its homogeneity. That is, the abrasive grains are evenly spaced and dispersed, leaving no clusters of grains or, conversely, pockets of bond.

These two unique qualities are of great significance in the grinding art. As one expert witness testified at trial, increased speed of operation has three consequences: (1) productivity increases in direct proportion to increases in speed; (2) it reduces costs because there is less use of individual abrasive grains; (3) it imparts a greater surface integrity to the workpiece. The same witness testified that Ramron's homogeneity gives it greater strength and also reduces metallurgical damage to the workpiece.

B. *The Prior Art*

There are two components of the prior art, although the Patent Office relied upon only one of these in rejecting appellant's claims. The first component consists of abrasive wheels used for removal of stock from workpieces, *i. e.*, grinding wheels. Typically, such wheels consist of concentrated abrasive material held together by rigid binders. In these wheels the abrasive grains touch each other, and are unevenly dispersed. Accordingly the wheels are quite brittle, and must be used at relatively low speeds or they will break in service. Moreover, prior art grinding wheels

---

12. As testimony of the experts makes evident, such a wheel possesses previously unmatched grinding capabilities. See further references to expert testimony, text, *infra*.

13. The testimony at trial indicated that conventional grinding wheels would break when roted at about 13,000 surface feet per minute, whereas the Ramron wheel was approximately twice as strong, indeed the evidence further indicated that there had never been a single complaint of the bursting of a Ramron wheel while in commercial use.

protruding excessively from such face under such operating pressures to bring such protruding grains into substantially the same plane as the other adjacent grains in the portion of the tool face under pressure contact with the work, whereby the work load is sustained by substantially all said grains across such face, simultaneously to permit the making of a deep precision cut in the work by such face while nevertheless producing a relatively smooth finish thereon and without premature dislodgment of such excessively protruding grains from such face.

wear quickly, and unevenly. The latter characteristic can produce both metallurgical—and geometrical—damage to a workpiece, leaving uneven cuts on the workpiece or corrugating the surface. Expert testimony at trial indicated that all prior art grinding wheels share these characteristics.

The second discernible component of the prior art is the Tocci-Guilbert patent, the sole reference upon which the Patent Office based its rejection of appellant's claims. In contrast to grinding wheels, Tocci-Guilbert teaches an abrading wheel constructed "for the particular operations . . . of graining, regraining, buffing, polishing, and burnishing." [14]

Tocci-Guilbert even stresses, as advantages contemplated in comparison with others, that the Tocci-Guilbert polishing wheels remove a very small amount of stock from the workpiece, and are intended principally to put a finish on a workpiece. Indeed, Tocci-Guilbert expressly disclaims any stock removal, and cites lack of stock removal as a major improvement of his own wheel over prior art polishing wheels. Further, Tocci-Guilbert expressly states that one of the principal objectives of his wheel is to provide polishing wheels

> . . . of such character [as] will accomplish their intended purpose with a minimum of surface marking on the working surface in the form of scratches, marks, grooves, etc. . . . Patent, Column 3, Lines 6–9.

Thus, Tocci-Guilbert contemplates only a "yieldable and resilient" wheel, which can "flow over irregular shapes" while maintaining the "necessary 'hardness' of the exterior abrading surface" to accomplish the required abrading tasks "with relatively light pressure". To be sure, Tocci-Guilbert teaches wheels of relatively high abrasive *content*, but the most demanding intended objective of his wheels appears to be "surfacing flat or irregular surfaces."

At no place in his patent does Tocci-Guilbert expressly or impliedly claim a grinding wheel; rather, as shown, he expressly disavows any stock removal purpose.

The Tocci-Guilbert patent calls for a process in which abrasive material is mixed with a plastic resin so as to obtain a relatively uniform dispersal of the grains throughout all the resin. Following this initial dispersal, the process calls for a controlled "foaming" of the resin further to disperse the abrasive grains.

The uniform dispersal of the grains gives structure to the soft resins employed by Tocci-Guilbert, and helps to produce the "essentially rigid" wheel which apparently eluded his predecessors. But, because the grains are widely spaced and therefore are capable of substantial retractile movement, the wheel can accomplish sufficient deformation to achieve the various polishing objectives claimed in the patent.

The prior art, as to conventional grinding wheels as well as to Tocci-Guilbert, contains all the teaching needed merely to produce *another* wheel. From the prior art *grinding* wheel come the lessons of tightly packed abrasive grains, and of centrifuging to achieve high pack density. From the prior art of *polishing* wheels—Tocci-Guilbert—come the lessons of using plastic resins and of foaming those resins to produce uniform dispersal of the abrasive material. We posit that much before undertaking further consideration of Charvat's Ramron.

C. *Differences in the Claimed Invention and the Prior Art*

We have explored the nature of the claimed invention and of the prior art. We must now examine the differences between them. Although we referred to prior art grinding wheels for background information, we are here concerned only with the Tocci-Guilbert ref-

---

14. Further specific references in this Part B to characteristics of, or as asserted in, the Tocci-Guilbert patent, appear at J.A. 443a.

erence. The essential difference between Tocci-Guilbert's wheel and appellant's claimed invention arises from the different objectives of each inventor. As discussed above, Tocci-Guilbert wishes to produce only a polishing wheel, whereas appellant's aim was to produce a wheel for high speed grinding. Accordingly, and quite contrary to Charvat's concept, Tocci-Guilbert disclosed a wheel in which the abrasive grains had to be widely and uniformly dispersed *throughout* the resin structure. Charvat, on the other hand, as his claims and specifications reveal, envisioned a wheel in which the abrasive grains are deliberately concentrated *at the edges of the wheel*; indeed, Tocci-Guilbert's polishing wheel is different even from all prior-art *grinding* wheels. The latter, with their concentration of abrasive grains at the outer edges of the wheel, nevertheless lacked the foaming disclosed by Charvat and so failed to achieve, first the compacting and then the separation of, the abrasive particles which had been elements of Charvat's process patent.

The Patent Office at trial argued that Tocci-Guilbert teaches a high concentration of abrasive grains (up to 85% of the wheel's components), but that position avails nothing in the circumstances here. As testimony at trial showed even if the wheel were made with stiff plastic resin—although Tocci-Guilbert teaches softer resins—a high abrasive content wheel constructed according to Tocci-Guilbert would be an ineffective grinding tool, whether compared to conventional prior art wheels, or to appellant's wheel. Tocci-Guilbert's wheel with its abrasive content mixed with its plastic resin is a disclosure only of a "heavy-duty" polishing wheel [15]—which is just what he sought to claim.

### D. *The Effect of the Differences on the Question of Obviousness*

Analyzing further the differences in the wheels, the Patent Office argues that it is "obvious" to pack the abrasive grains at the edge of the wheel by centrifuging, and to disperse them by foaming and gellation. But this is not enough, even as Tocci-Guilbert seems clearly to imply. For instance, it is not obvious from Tocci-Guilbert that a wheel could be constructed using plastic resins unless the abrasive grains were dispersed throughout the resin. Nor does it appear obvious that one could centrifuge the abrasive grains and yet retain enough resin in the interstices of the grains to permit a foaming process that achieves homogeneous distribution of those grains. Nor does it seem "obvious" from Tocci-Guilbert that a wheel in which the grains do not touch each other—although they are but a grain's diameter apart—would be sufficiently rigid to be a useful high-speed grinding wheel.

In retrospect these facts seem the essence of simplicity. But they are not to be judged in retrospect; rather, the test of obviousness "must be applied as of the time of the invention and not retrospectively as of the time of the suit." [16]

At the time of Charvat's invention, the use of plastic resins as viable binders in commercial abrasive wheels was entirely novel. Tocci-Guilbert, whose patent application was filed eighteen months prior to appellant's, and four years after appellant began his research,

---

15. Although the Patent Office examiner discerned the use in Tocci-Guilbert of such terms as "grinding" and "snagging", we think such language must be measured and interpreted as relating to what Tocci-Guilbert sought to accomplish, such as "full face abrading and polishing operations, on a stationary mount . . .". (Column 9, lines 60–61). Indeed, each reference the Patent Office cites in Tocci-Guilbert teaches only a variety of polishing wheel. There was evidence at trial that a Tocci-Guilbert wheel when put to a "grinding" test burst at 9,950 surface feet per minute, some 3,000 s. f. m. less than prior art resinoid and vitrified grinding wheels.

16. Higley v. Brenner, *supra* note 2, 387 F.2d at 858; *see also* L-O-F Glass Fibers Co. v. Watson, *supra* note 2, 228 F.2d at 43.

pioneered in adaptation of such resins in abrading wheels used for polishing. But while Tocci-Guilbert's teaching is instructive so far as his goal was made to appear, it did not anticipate appellant's substantial advance in the different, albeit related, art of abrading wheels used for grinding.[17]

We recognize that much of what we have said above merely approaches a discernment as to what may be the level of ordinary skill in the abrading wheel art. And, as a court, we would not presume that our untutored conclusions match those of a person of ordinary skill in the art. Thus we may take into account, not only the testimony of Charvat himself, but presently, even more important, that of his experts. For example, Mr. John A. Mueller was not only an unchallenged expert, the Patent Office counsel stipulated his qualifications.[18] The record discloses that Mr. Mueller indeed was possessed of greater than ordinary skill in the art, well versed in all aspects of industrial grinding. After testifying that the Tocci-Guilbert patent does not teach the Ramron wheel to one of ordinary skill in the art, Mr. Mueller was questioned and answered as follows:

Q. In your judgment, does the Tocci-Guilbert reference disclose or suggest to one skilled in the grinding art the manufacture of a grinding wheel such as the Ramron wheel as called for in the claims now before this court?

A. *It did not suggest that wheel to me.* (Emphasis added).

Q. To your knowledge, did it suggest it to anyone else?

A. Not to my knowledge.

Pausing for the moment, we may take into account secondary tests of non-obviousness which can give us adequate guidance in the present case. We observe at once that the testimony at trial establishes beyond doubt that the Ramron wheel's unique qualities have brought it substantial commercial success. As Mr. Mueller stated in his testimony:

. . . I think we have a combination in the Ramron wheel of strength and also of the ability to operate at higher wheel speeds, and this appears to me to be unique in the grinding industry.

The Patent Office, on the other hand, rejected evidence of commercial success. Rather than ascribing such success to Ramron's uniqueness as a grinding wheel, the Patent Office concluded that Ramron's success might be due to "availability of particular raw materials, business relationships, advertising, or financial acumen, etc." That is not our record. We note that testimony at trial showed conclusively that Ramron's commercial success resulted principally from its qualities as a grinding wheel.

Specifically, *e. g.*, we refer to testimony of Mr. Griffiths about grinding operations at United Engineering and Foundry Co., a manufacturer of solid steel rolls for use in steel and paper mills.[19] United purchased from the

---

17. It may well be that the trial judge failed to understand the nature of just what was involved in the achievement of Charvat's substantial advance. For example he thought that Charvat's application had called "for the additional process of foaming or gellation of the mixture to provide for dispersal of the abrasive grains over the surface of the wheel." He even added that one skilled in the art would resolve the difference between the two types of wheel "through the extra step of gellation". In fact, the gellation aspect was common to *both* wheels, and what Charvat relied upon was the step of centrifuging, thus substantially compacting the abrasive grains, but

with resin-filled spaces, after which there was controlled foaming, before the particles were gelled and fixed. Charvat was working in a completely different art as he sought removal of a great amount of stock from a work-piece.

18. Mr. Mueller, with his degree in electrical engineering against a background of training at Rensselaer Polytechnic Institute, M.I.T. and Cornell, had since 1942 been associated with and was at the time of trial manager of the Abrasive Systems Development Group of Carborundum Company of New York.

19. Another of Charvat's experts, Mr. Richard P. Griffiths, was, from 1951 until his

Landis Company a grinding machine that could be used to remove excess stock from its largest rolls. Landis delivered the machine, the largest of its kind in the United States, with assurances that it would remove 18 cubic inches of stock per minute. As delivered, the machine developed 200 horsepower and utilized five conventional grinding wheels simultaneously.

Experience disclosed that the machine performed unsatisfactorily with the conventional wheels. In fact, United tried some 160 different prior art grinding wheels without success. As the supervisor of United's operation explained,

> We weren't able to utilize all the horsepower that was in the machine for the simple reason that when we tried to add the pressure of the full horsepower, we were getting numerous chatter and bouncing [a condition that leaves an unsatisfactory corrugated surface on the workpiece], and it required us that every pass that we made, we had to go back and take the wheels . . . away from the job and take it down to the end of the machine and using a diamond, we would have to dress the wheel.
>
> So, that wasn't feasible, and we were losing a good deal of time.

On the other hand, the Landis grinder performed adequately using appellant's wheel. In fact, United found appellant's wheel to be the *only* wheel by which the potential of the Landis machine could be realized.

Thus, Ramron secured for United the full benefits of the Landis machine, benefits which could not be obtained with prior art wheels. The witness Griffiths further testified as follows:

Q. Do you consider your Company, the United Engineering and Foundry Company, has benefited by the introduction of the Ramron wheel from the point of view of efficiency, cost, and production.

A. Oh my, yes, yes.

Q. Do you consider that the Ramron wheel as a commercial item represents an advance in the grinding art over anything used before in the same category?

A. My personal opinion, yes.

Q. What, by way of summary, would you term these advantages?

A. Well, first, naturally the terriffic stock removal that you receive. They are a type of wheel that they have, we can use the excessive horsepower without chatter, and without bouncing. We make a product that is subject to scrap if we get too much heat in a roll, and we actually are probably saving two or three changes in operations of wheels for the simple reason with our old type of conventional wheel, due to the chatter and bounce you had to leave approximately 25 thousandths of stock on the work and that naturally had to be taken off.

So, consequently, it saves you not only a great deal of time, it saved you a lot of down time in changing wheels, it gave you a product of good commercial finish that you could actually take out when you were finished with the Ramron wheels and sell it to a customer as a good commercial roll.

Thus, using two Ramron wheels rather than five conventional wheels, and working at full horsepower, the Landis grinder removed twice as much stock as conventional wheels without chatter and

retirement in 1969, Superintendent of the Roll and Machine Shop at Canton, Ohio, for United Engineering and Foundry Co. He was in charge of all production at the plant, turning out some 2,000 tons of rolls each month. United on his recommendation had purchased the largest grinding machine in the country from the Landis Company. He had tested approximately 160 different grinding wheels before choosing the Ramron wheel with its capacity of removal of excess stock to precise dimensions without causing metallurgical damage to the product. United could satisfactorily use no other wheel than Ramron which had been found to solve a serious grinding problem.

bounce, and without needing to be dressed.

Moreover, the Ramron wheels never once burst, despite the heavy demands of service on the Landis machine, an experience much different from that with conventional grinding wheels. Finally, the witness testified that United had failed in a continuing search for an adequate substitute for the Ramron, a search stimulated by the need to insure against its possible unavailability.

United Engineering's experience can be seen to show conclusively that appellant's wheel is "a new result, an unexpected result, a far more efficient result . . . " within the meaning of *Higley, supra.* We can assume that the increased rate of stock removal can be ascribed in part to the Landis grinder itself. But what is important is that *without the Ramron wheel, the Landis machine would be "useless,"* in the words of United's supervisor.

■ The uncontradicted testimony of Messrs. Mueller and Griffiths confirms our conviction that the Ramron wheel is a unique invention that makes possible grinding operations of a quantity and quality which was not and could not be achieved with prior art grinding wheels. When an invention has so "substantially advanced the art," as we believe appellant's wheel has done, then we must be "liberal in [our] construction of the patent, to secure to the inventor the reward he deserves."[20] Thus, looking to appellant's *"new result"* and the *commercial* success of his device, we reject the District Court's finding that the claimed invention would be obvious within the intendment of 35 U.S.C. § 103.[21]

## II.

### THE PARTICULARITY OF APPELLANT'S CLAIMS

Our disagreement with the district court respecting "obviousness" requires that we address the issue, not reached by the district court, as to the rejection by the Patent Office of certain of appellant's claims, assertedly because of noncompliance with 35 U.S.C. § 112. Because Charvat's claims are part of the record, and because the issue presented is purly legal, *i. e.,* application of the statute to undisputed facts of record, and because it seems in the interests of both parties to terminate this lengthy proceeding, we will not remand the case to the District Court for further consideration.

Section 112 provides:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. . . .

\* \* \* \* \* \*

Relying on the language in the second paragraph of Section 112, the Patent Office rejected appellant's claims 38–40 and 42–48,[22] deeming those claims to be "unduly broad in the description of the

20. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 328, 67 L.Ed. 523 (1923), *quoted in* L-O-F Glass Fibers Co. v. Watson, *supra* note 2, 228 F.2d at 47 n. 15.

21. Higley v. Brenner, *supra* note 2, 387 F.2d at 858. *See also* Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); The Barbed Wire Patent, 143 U.S.

275, 12 S.Ct. 443, 36 L.Ed. 154 (1891); Loom Co. v. Higgins, 105 U.S. 580, 591–592, 26 L.Ed. 1177 (1882).

22. We set out the claims here involved, viz:
 38. A grinding tool adapted for rapid grinding of a deep predetermined precision cut in a steel part, said tool comprising a non-brittle resin binder body which is rigid and dimensionally stable under the

resinous binder, . . . [and] unduly broad and vague in the use of various purely relative expressions."

The Patent Office posited that appellant had claimed too inclusive a group of resins, including resins that would not work in appellant's claimed wheel (such as non-foaming resins). Additionally rejected was appellant's use of relative terms such as "on the order of", "slightly spaced apart", and "high concentration" in describing the claimed invention.

An abstract reading of the claims at issue is irrelevant to our consideration. Rather, the issue for this court is whether the language of the claims is so indefinite as to defeat the purposes of the statutory requirement of precision. Accordingly, courts have frequently validated claims, even when seemingly vague as including such words as "high" and "substantial." [23]

Courts have so ruled when they could find that the claim as written, when read in context of the particular case, met a suitable standard of precision—a standard which varies from case to case.[24] Apropos here is the Second Circuit's description of the judicial process which we should apply:

[The statutory requirement of precision] serves two primary purposes: those skilled in the art must be able to

required grinding pressures thereby to ensure such precision,

and a high concentration of abrasive grains uniformly incorporated and embedded in said binder,

substantially all said grains nevertheless being only very slightly spaced apart in said body

and the latter being just sufficiently locally yieldable under such grinding pressures at the working face of said tool to afford individual relative microadjustment of said spaced grains exposed thereat for energy absorption and stress distribution, when such grains are subjected to heavy impact forces when engaging the work without appreciable change in the conformation of such working face.

39. The grinding tool of claim 38 wherein said resin is selected from the class consisting of polyurethane resin, epoxy resin, phenolic resin, and silicone resin.

40. The grinding tool of claim 38 wherein said resin is a foamed resin selected from the class consisting of polyurethane resin, epoxy resin, phenolic resin, and silicone resin.

41. The grinding tool of claim 38 wherein said resin is a closed cell foamed resin selected from the group consisting of aromatic polyether polyurethanes and aromatic polyester polyurethanes.

42. The grinding tool of claim 38 wherein the abrasive content of a unit volume of said tool by weight is equal to at least approximately 75% of the pack density of the particular abrasive grains employed.

48. A grinding tool adapted for rapid grinding of a deep predetermined precision cut in a steel part, said tool comprising

a non-brittle resin binder body which is rigid and dimensionally stable under the required grinding pressures thereby to ensure such precision,

and a high concentration of abrasive grains uniformly incorporated and embedded in said binder,

the abrasive density of said tool in grams per cubic centimeter being at least 1.28,

substantially all said grains nevertheless being spaced apart in said body just short of contact with each other,

and the interposed resin of said body being just sufficiently yieldable to afford individual micro-adjustment of said grains exposed at the working face of said tool when said tool is subjected to grinding pressure in use on the order of at least 1,000 pounds per square inch, thereby to achieve energy absorption and stress distribution when said exposed grains are subjected to heavy impact forces when engaging the work, without, however, appreciable change in the dimensions of said body or the conformation of such working face.

23. Eibel Process Co. v. Minnesota & Ontario Paper Co., *supra* note 20, 261 U.S. at 65–66, 43 S.Ct. at 329; Arnold Pipe Rentals Co. v. Engineering Enterprises, Inc., 350 F.2d 885, 892–893 (5 C.A. 1965):

Absolute precision in the wording of claims, while desirable, would be an unreasonable burden to impose on an inventor. Descriptive words such as "substantial," "high," "about," and "slight excess" have often withstood attack under § 112.

*See also* Georgia Kaolin Co. v. Thiele Kaolin Co., 228 F.2d 267 (5 C.A. 1955).

24. Chicago Pneumatic Tool Co. v. Hughes Tool Co., 97 F.2d 945, 948 (10 C.A.) cert. denied 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 415 (1938), *cited* in Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 136 (2 C.A. 1958):

Objectionable indefiniteness must be determined by the facts in each case, not by reference to an abstract rule.

understand and apply the teachings of the invention and enterprise and experimentation must not be discouraged by the creation of an area of uncertainty as to the scope of the invention. On the other hand, the policy of the patent statute contemplates granting protection to valid inventions, and this policy would be defeated if protection were to be accorded only to those patents which were capable of precise definition. The judicial function requires a balancing of these competing considerations in the individual case.[25]

We do not have merely "inaccurate suggestions of the functions of the product" which the Supreme Court has deemed to "fall afoul of the rule that a patentee may not broaden his claims by describing the product in terms of function."[26]

Rather, as we have noted, objectionable indefiniteness is to be determined by the facts in each case, and not by some reference to an abstract rule. The Second Circuit has said what we wish to say is applicable here:

On the other hand, patentable inventions cannot always be described in terms of exact measurements, symbols and formulae, and the applicant necessarily must use the meager tools provided by language, tools which admittedly lack exactitude and precision. If the claims, *read in the light of the specifications,* reasonable apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more. [Citations omitted] That an area of uncertainty

necessarily exists in such a situation cannot be denied, but the existence of an inescapable area of uncertainty is not sufficient justification for denying to the patentee the fruits of his invention.[27] (Emphasis added).

These cases refine the issue we face: when read by a person of ordinary skill in the grinding art, are appellant's claims sufficiently definite (1) to distinguish the claims from prior art; (2) "to circumscribe what is foreclosed from future enterprise;" and (3) to allow production of the claimed invention without undue experimentation? And when answering these questions, we must look not only to the language of the claim but also to the specifications, for it is settled that details in the specifications will save ambiguous claims.[28]

In addition to the claims, appellant's application contains the following information, as our Joint Appendix discloses:

(1) the form of and problems with the prior art wheels and the differences contained in claimed wheel;

(2) eleven Figures depicting the inherent character of the claimed wheel;

(3) the preferred method of manufacture;

(4) a description of the type of abrasive material preferred;

(5) the type of filler material suggested;

(6) the type of binding material suggested specifying four preferred resins and giving their formulas;

(7) a detailed description of the composition and density of the wheel;

25. Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 136 (2 C.A. 1958). *See also* Ansul Co. v. Uniroyal, Inc., 448 F.2d 872, 877–879 (2 C.A. 1971).

26. United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 234, 63 S.Ct. 165, 168, 87 L. Ed. 232 (1942).

27. Georgia-Pacific Corp. v. United States Plywood Corp., *supra* note 25, 258 F.2d at 136.

28. Application of Miles, 463 F.2d 1401 (C.C. P.A.1972); Georgia-Pacific Corp. v. United States Plywood Corp., *supra* note 25, 258 F.2d at 135; Aluminum Company of America v. Thompson Products, 122 F.2d 796 (6 C.A. 1941); Westinghouse Electric & M'fring Co. v. Quackenbush, 53 F.2d 632, 634 (6 C.A.1931); *and see* United States v. Adams, 383 U.S. 39, 48, 86 S.Ct. 708, 15 L. Ed.2d 572 (1966).

(8) basic wheel characteristics;

(9) other tool forms for which the wheel mixture may be utilized.

It is with this information from the specifications that we must read the claims, together with knowledge that appellant had previously received a patent for this *method* of constructing the Ramron wheel.

We turn then to the first test, *supra*, page 149, whether the instant claims are distinctive enough to distinguish the claimed invention from the prior art. In light of our discussion of the prior art in Part I, there appears little doubt that appellant's claims are sufficiently definite, when read with the specifications, to distinguish appellant's wheel from prior art, both Tocci-Guilbert and conventional prior-art grinding wheels. We have previously pointed out the critically distinguishing features. Under the circumstances, an overly broad description of resins becomes irrelevant. Likewise, the challenged use of relative expressions is not so vague as to fail to distinguish appellant's wheel from a polishing wheel—indeed, the latter is not even meant to withstand pressures "on the order of 1,000 pounds per square inch."

Our conclusion assumes, of course, that the phrase "on the order of" would trigger some recognition in a person of ordinary skill in the grinding art, perhaps delineating, at a minimum, heavy-duty grinding wheels from polishing wheels. As for the other relative phrases—such as "high concentration," and particles that are "slightly spread apart" —it seems certain to us that such a person would not fail to distinguish the claimed wheel from Tocci-Guilbert when he reads the detailed figures and descriptions in the specifications, as well as the description of the preferred method of manufacture. Even if broadly

construed, these relative expressions describe a grinding wheel which is fundamentally different in structure from Tocci-Guilbert as our earlier analysis demonstrates.

And, of course, appellant's claims, no matter how broadly written, are surely definite enough, merely in claiming the use of *polyurethane resins* of whatever formula, to distinguish appellant's wheel from prior-art grinding wheels. Accordingly, the language of the challenged claims is sufficiently precise to distinguish appellant's claimed invention from the prior art, and especially from Tocci-Guilbert.

The next test is whether the claims are so broad that they do not adequately "circumscribe what is foreclosed from future enterprise." Although the resolution of this question necessarily may seem speculative,[29] we are convinced that appellant's claims are adequate, for when viewed in the whole context of the application's specifications and of its eleven different figures, we may see that the claims define a discrete product. An analysis of the relationship between the Patent Office's challenge to the claims and the instant inquiry is now in order.

The Patent Office's principal challenge is to appellant's broad claims concerning appropriate resins, but that position is ineffectual for several reasons. First, even if appellant's claims are broad enough to include resins which could not be used to produce his invention, that fact does not render appellant's claims too vague with reference to future enterprise. The claims perforce will inform potential inventors that *any* plastic resin which *does* work to produce appellant's wheel is covered by the patent. That is, appellant's patent will be construed, logically, to include all resins which would produce his wheel. Again, the Patent Office objects to appellant's

---

29. Judge Hand has said determination of whether there is a patentable invention "is as fugitive, impalpable, wayward, and vague a phantom as exists in the whole paraphernalia of legal concepts," Harries v. Air King Products Co., 183 F.2d 158, 162 (2 C.A. 1950), a comment viewed by the Supreme Court as a "lament." Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 492, 94 S.Ct. 1879, *supra* (n. 22, May 13, 1974).

use of "relative" expressions in his claims. We have pointed out earlier that these expressions, while relative in the abstract, take on sufficiently precise meaning when a person of ordinary skill in the art reads them together with the details contained in the figures and specifications. More importantly, however, in the context of circumscribing future enterprise, this particular objection seems irrelevant. Viewed from the perspective of a potential inventor, the challenged expressions would be sufficiently narrow to define the wheel adequately, for the claims, when read together with the specifications, have a very low degree of variation. Thus, the statement that the grains are to be "slightly" spread apart is not overly ambiguous when read with a specification that the density of the wheel must be at least 1.8 grams per cubic centimeter.

Likewise, the specifications are sufficiently detailed to give meaning to appellant's claim of a "high" concentration of grain. Certainly such a claim appears no more ambiguous than Tocci-Guilbert's claim of a wheel in which abrasive content may vary from 10 per cent to 80 per cent. Indeed, one of the prominent features of the art appears to be that the grain content of the wheel must vary according to the specific needs of customers. Thus, the Patent Office's objections to appellant's claims as too indefinite do not appear to us to raise the specter of unwitting infringement by future innovators. Rather, the claims seem broad enough "to permit a reasonable tolerance in commercial practice of inventions . . .," [30] a breadth which we do not disapprove.

The final test is whether the appellant's claims are sufficiently definite to allow a person of ordinary skill in the art to produce appellant's wheel without undue experimentation. Since as previously noted, appellant has already received a process patent, that very fact implies that one skilled in the art could easily and mechanically reproduce the claimed invention. Moreover, the specifications include a description of the preferred method of manufacturing the wheel, the four preferred resins, the preferred abrasive and fillers, together with descriptions of the content and density of the wheel. Accordingly, the claims, when read with these specifications, would easily lead one to appellant's wheel.

■ Thus guided, one skilled in the art surely "could determine and select the necessary experiments or tests without unreasonable difficulty." [31] He certainly would refrain from use of nonfoaming resins. He quickly would ascertain the useful parameters of abrasive content and spacing. We are led to the conclusion that appellant's claims are not overly broad and should be approved, for they adequately accomplish the purposes which the Supreme Court has ascribed to Section 112.

### III.

### CONCLUSION

We reach our conclusion here quite aware that as a court we are not as well equipped as those skilled in the art to analyze technical phenomena. But we have a substantial record which we have analyzed with great care in light of the well presented arguments of competing counsel. Uncontroverted by any affirmative evidence of the Patent Office, there is strong evidence in that record from which have been demonstrated the uniqueness and value of the claimed invention. Our conclusion stems from our "thorough conviction" [32] that Charvat

---

30. Georgia Kaolin Co. v. Thiele Kaolin Co., *supra* note 23, 228 F.2d at 272.

31. Ansul Co. v. Uniroyal, Inc., *supra* note 25, 448 F.2d at 878.

32. *See* our references in note 1, *supra*. We are fortified in our conclusion here in that the record discloses an obvious and exceptional showing of error in the District Court, *cf.* note 17, *supra*, especially in light of the impressive new evidence there presented which had not been available to the Patent Office.

Our respected colleague's dissenting text fails to take account of the record Charvat had made in the District Court. We are

has produced invention and that he is entitled to the fruits of his efforts and of his skills. Accordingly, we reverse and remand with the instruction that the District Court enter its order that the Commissioner is authorized to issue to Charvat a patent on his grinding wheel as claimed in the application of record.

So ordered.

MacKINNON, Circuit Judge (dissenting):

The majority opinion concludes that the Patent Office erred in refusing to grant appellant a patent on his grinding wheel. Since the Patent Office rejected appellant's application under 35 U.S.C. § 103 on the ground that the claimed invention was obvious in view of the Tocci-Guilbert patent (U.S. Patent No. 3,252,775, issued May 24, 1966), the central issue is whether, given the Tocci-Guilbert disclosure, it would be obvious to one of ordinary skill in the art to arrive at applicant's invention as described in the claims. I dissent from the majority opinion because *there is no basis in the claims for the structural distinction upon which the majority premises patentability*. The majority errs by confusing the detailed description of the grinding wheel in the specification with the much broader description in the claims. Appellant's claims include no element which is patentably distinct from the cited Tocci-Guilbert reference.

A fundamental tenet of patent law is that the claims are the measure of the invention. See, e. g., Graham v. John Deere Co., 383 U.S. 1, 17, 26, 32, 34, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Milcor Steel Co. v. George A. Fuller Co., 316 U.S. 143, 145–146, 62 S.Ct. 969, 86 L.Ed. 1332 (1942); Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 419, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); 4 Walker on Patents § 241 (Deller ed. 1965). The claims of a pat-

ent delineate the differences between the prior art and the invention. This rule is embodied in 35 U.S.C. § 112 which states: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

Since the validity of a patent depends on the inventive elements which are specified in the claims, it is possible for an inventor to *disclose* patentable subject matter in his application and yet not receive a patent because he failed properly to *claim* his invention. Beckman Instruments, Inc. v. Chemtronics, Inc., 439 F.2d 1369, 1274 & n.8 (5th Cir.), cert. denied, 400 U.S. 956, 91 S.Ct. 353, 354, 27 L.Ed.2d 264 (1970); see Murton v. Ladd, 122 U.S.App.D.C. 274, 276, 352 F.2d 942, 944 (1965); Siegel v. Watson, 105 U.S.App.D.C. 344, 346, 267 F.2d 621, 623 (1959); 4 Walker on Patents § 240 (Deller ed. 1965). While it is often stated that the claims must be read in light of the specification, this statement does not mean that essential elements totally lacking in the claims may be supplied by reference to the specification. The specification properly serves to explain the meaning of an abstract term or to limit the scope of the words used in the claims, but patentability cannot be premised upon structural elements which appear in the specification but are entirely omitted from the claims. Altoona Theatres v. Tri-Ergon Corp., 294 U.S. 477, 487, 55 S.Ct. 455, 79 L.Ed. 1005 (1935); Beckman Instruments, Inc. v. Chemtronics, Inc., 439 F.2d 1369, 1377–1378 & n.17 (5th Cir.), cert. denied, 400 U.S. 956, 91 S.Ct. 353, 354, 27 L.Ed.2d 264 (1970); John Deere Co. v. Graham, 333 F.2d 529, 534 (8th Cir. 1964), aff'd, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); In re Prater, 415 F.2d 1393, 1404–1405, 56 CCPA 1381 (1969). Otherwise, the patentee

---

satisfied that the respective viewpoints have now been adequately ventilated, particularly reflecting the extensive intra-court exchanges referred to, *supra* page 139.

The majority adheres to its conclusion that Charvat is entitled to his patent.

would receive a patent monopoly far broader than his actual invention.

The majority opinion, after thoroughly reviewing the alleged invention and the state of the art, concludes that the "essential difference between Tocci-Guilbert's wheel and appellant's claimed invention arises from the different objectives of each inventor"—grinding versus polishing. Majority Opinion at 144. Pursuing this different objective, appellant added a step in the manufacture of his wheel which was not present in the manufacture of the Tocci-Guilbert wheel. Thus, after mixing the abrasive with the resin, appellant centrifuges the mixture. This additional step in the manufacturing process apparently results in the single structural difference between appellant's grinding wheel and Tocci-Guilbert's abrading and polishing wheel—in appellant's wheel the abrasive grains are more concentrated in a circumferential region near the periphery of the wheel. The majority opinion describes this structural difference as follows:

> Accordingly, and quite contrary to Charvat's concept, Tocci-Guilbert disclosed a wheel in which the abrasive grains had to be widely and uniformly dispersed *throughout* the resin structure. Charvat, on the other hand, as his claims and specifications reveal, envisioned a wheel in which the abrasive grains are deliberately concentrated *at the edges of the wheel* . . . .

*Id.* (emphasis in original). In his briefs before this court, appellant repeatedly emphasizes the importance of his centrifuging process and the resulting concentration of abrasive at the periphery of the wheel:

> In plaintiff's process the abrasive grit/resin mixture is centrifuged to concentrate the grit particles against the peripheral wall of the mold with only a small amount of resin between

the particles whereas the reference merely mixes the abrasive grit and the foamable resin without any centrifuging.

\* \* \* \* \* \*

> Plaintiff's process differs in that an additional step is inserted between the mixing and the foaming, namely, centrifuging.

Brief for Appellant at 20; Reply Brief for Appellant at 4. It must be remembered that centrifuging is a process, not a product. Appellant has already been granted a patent for his manufacturing *process*. He is here attempting to obtain a patent on the structure of the *product* which results from his unique manufacturing process.

The difficulty with the majority's decision to allow the product patent premised on the additional step of centrifuging is that neither centrifuging nor any structural result of centrifuging appears in the claims. Original claim 1, which is no longer in the case, did include a structural result of the centrifuging process, described as follows:

> . . . *an outer circumferential region of said wheel containing concentrated granular abrasive* and a radially inner portion of said wheel being substantially abrasive free, with the abrasive grains of said outer circumferential region . . . .

Jt.App. at 299a (emphasis added). However, appellant did not consider the circumferential concentration of abrasive to be a significant aspect of his invention. In his response to the first Patent Office rejection of the application, appellant's attorney stated:

> There is no claim in the present application broadly to an abrasive wheel having an outer abrasive zone and an inner non-abrasive zone of plastic or otherwise. The claims all rely on other features . . . for patentability . . . .

\* \* \* \* \* \*

As noted above, the provision of the abrasive-free area is not an essential feature of the present invention although it may ordinarily be produced when employing applicant's preferred method of manufacture.

Jt.App. at 255a–56a. Having expressly disclaimed any reliance on this structural consequence of certrifuging, appellant withdrew claim 1 from his application while it was pending before the Patent Office. Jt.App. at 361a.

The only claims presently in the application are claims 2–5, 38–43, 45, 47 and 48. These claims contain no reference either to centrifuging or to any structural result thereof. For example, claim 2 specifies "granular abrasive dispersed *uniformly* and embedded therein," and claims 38 and 48 specify "abrasive grains *uniformly* incorporated and embedded in said binder." (Emphasis added.) Thus, the majority has premised patentability on an element which is expressly contradicted by appellant's claims. Far from distinguishing the invention from the prior art, the claim language demonstrates that appellant's invention is remarkably similar, if not the same as, Tocci-Guilbert's patented wheel, which is described and claimed as having "a substantially *uniform* dispersal of abrasive grit throughout said body." Tocci-Guilbert Patent, column 14, lines 36–37, 71–72 (emphasis added).

The majority's emphasis on centrifuging as a distinction from the prior art is entirely misplaced. At the trial in the district court, appellant admitted that the centrifuging technique "is old in the art" of manufacturing grinding wheels. Jt.App. at 91a. Since centrifuging is well known in the art, it follows that the circumferential concentration of abrasive, which is a natural consequence of centrifuging, is also known in the art. Although the initial Patent Office rejections cited patented examples of the centrifuging technique, these references became irrelevant to the application for a product patent after appellant withdrew his original claim 1. The Patent Office brief in this court did not focus upon the centrifuging technique, apparently because appellant never even suggested to the Patent Office Board of Appeals that the circumferential concentration of abrasive was an important feature of his alleged invention. See Jt.App. at 361a–94a, 423a–29a. Thus, the majority bases their decision on a feature which is not only absent from the claims, but which is also old in the art and irrelevant to the Patent Office rejection under review.

All of the structural elements recited in appellant's claims are anticipated by the Tocci-Guilbert reference. For example, claim 2 compares with the Tocci-Guilbert patent as follows. The language in claim 2 which is not clearly anticipated by Tocci-Guilbert is italicized.

| Appellant's Claim 2 | Tocci-Guilbert Patent |
| --- | --- |
| A grinding tool comprising | Wheels of the type shown are frequently referred to as "set up" or "snagging" wheels and are widely used in many abrading or polishing operations, such as stripping, plating, snagging work, polishing, light stock removal, and other surface work . . . . [Col. 8, lines 40–45.] The abrasive foam wheels . . . have been found to be particularly successful in full face grinding operations . . . . [Col. 7, lines 54–56.] |

an essentially rigid, dimensionally stable body of cellular polyurethane resin binder

A preferred cellular foamed plastic composition for carrying out the invention comprises the group of polyurethane foams. [S]uch foams may be either rigid or flexible, hard and abrasive, or soft and resilient, depending upon components, filters, and methods of foaming. [Col. 10, lines 22–28.]

selected from the group consisting of aromatic polyether polyurethanes and aromatic polyester polyurethanes

[T]he commercial "polyurethanes" are . . . polyester or polyether resins and, as such, are more correctly descibed as poly-(ester)urethanes and poly(ether)-urethanes, respectively. The present invention can be satisfactorily practiced with foams of both the poly(ester)urethane or poly(ether)urethane type . . . . [Col. 10, lines 49–55.]

and granular abrasive dispersed uniformly embedded therein,

A substantially uniform dispersal of abrasive grit throughout said body. [Col. 14, lines 36–37, 71–72.]

the grains comprising such abrasive being spaced only slightly apart

[See the "void spaces" between the particles of abrasive grit. Col. 8, line 2; col. 14, line 41; figs. 8, 9.]

and said resin being capable of slightly local stubborn resilient yielding action to an extent allowing corresponding slight local individual movement of said grains exposed to the tool face relative to other adjacent grains in such face, but said body as a whole being sufficiently rigid to support the grinding face of said tool and to make a *grinding cut of precise predetermined depth* under operating pressures in use, such slight local yielding action of said resin at such grinding face being sufficient to insure readjustment of the positions of individual grains protruding excessively from such face under such operating pressures as to bring such protruding grains into substantially the same

The abrasive particles 34 adjacent the work surface, through wear or in the initial molding, frequently present protruding sharp points or projections, as indicated at 84. However, upon application of an abrading or polishing pressure, as in Figure 9, the retractile nature of the grit particles permits these projection points to retract into the void spaces provided by the cells 86, without in any way disturbing the bond between the particles and the cellular foam. The abrasive foam composition thus functions, unlike any other type of abrasive composition, to exert a substantially uniform pressure upon the surface of the work piece. [Col. 7, line 71 to col. 8, line 7.]

plane as the other adjacent grains in the portion of the tool face under pressure contact with the work, whereby the work load is sustained by substantially all said grains across such face,

simultaneously to permit the making of a *deep precision cut* in the work by such face while nevertheless producing a relatively smooth finish thereon without premature dislodgment of such excessively protruding grains from such face.

Moreover, with the devices of the invention, this pressure remains substantially the same over a rather wide range of operating pressures, thus insuring substantially uniform scratch patterns throughout such range of operating pressures. [Col. 8, lines 7–11.]

———————

Assuming for purposes of argument that the Tocci-Guilbert disclosure is limited to a "polishing" wheel, the foregoing comparison of claim 2 with the Tocci-Guilbert patent demonstrates that the only real difference between the claimed invention and the Tocci-Guilbert structure is the intended use·of appellant's invention for grinding rather than polishing. However, this difference is not a patentable distinction. The "grinding" limitation appears in appellant's claims only in terms of his intended *result*. Since the claims recite the same structural elements as Tocci-Guilbert, appellant has failed to identify any inventive *structure* which accomplishes his allegedly unique result. It is as if appellant claimed "the structure of the Tocci-Guilbert wheel usable for grinding purposes." Such a claim is unpatentable because it is written solely in conclusory terms and contains no description of any structural difference which enables the known device to be used for the new purpose. See L. Horwitz, Patent Office Rules and Practice § 75.18 (1973); 4 Walker on Patents § 241, at 111 (Deller ed. 1965). One is simply unable to discern any structural difference between Tocci-Guilbert's "polishing" wheel and the "grinding" wheel as described in the claims. As the Patent Office Board of Appeals commented, "the nature of ap-

pellant's claims are [*sic*] such as to leave a real doubt as to what appellant believes his invention to be." Jt.App. at 434a.

The majority's heavy reliance on the record made in the district court, see Majority Opinion at 15–19, including the testimony concerning commercial success and nonobviousness, does not correct the fatal deficiency of appellant's claims which fail to specify any structural distinction between the alleged invention and the prior art. The claims are the measure of the invention. Since the validity of the patent depends upon the claims finally acted on by the Patent Office, a substantive defect in the claims cannot be cured by testimony at trial.

The majority opinion necessarily leaves the Patent Office in a quandary. Under the majority decision, the Patent Office is reversed for failing to grant a patent based upon a structural element which does not appear in the claims. The majority apparently expects the Patent Office to search the prior art for every feature of an invention disclosed anywhere in the specification, even though not recited in the claims—a virtually impossible chore for an already overburdened agency. I respectfully dissent from this misinterpretation of the applicable law.